**ALLIED EQUIPMENT COMPANY, Incorporated, Appellant,**

v.

**WEBER ENGINEERED PRODUCTS, INCORPORATED, et al., Appellees.**

No. 7208.

United States Court of Appeals Fourth Circuit.

Argued June 21, 1956.

Decided Oct. 1, 1956.

Robert R. Gwathmey, III, and George E. Allen, Richmond, Va. (Allen, Allen, Allen & Allen, Richmond, Va., on the brief), for appellant.

William H. King, Richmond, Va. (Robert H. Paterson, Jr., and McGuire, Eggleston, Bocock & Woods, Richmond, Va., on the brief), for appellees.

Before PARKER, Chief Judge, and SOPER and PRETTYMAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

Our appellant, in this litigation called simply "Allied", is a business concern of Richmond, Virginia, which, in addition to a retail sales business in farm and garden equipment, held a number of distributor franchises for that equipment. Our appellee, called herein simply "Weber", is a manufacturer of such equipment. In the summer of 1949 the two concerns made an arrangement by which Weber gave Allied a wholesale distributorship on an exclusive basis in 85 counties in Virginia. It was understood that Allied would develop a distribution system throughout this territory, and it proceeded to do so. It increased the number of dealers in Weber products from four or five in 1949 to over a hundred in 1953. Allied says that in doing so it expended large sums of money. In the latter part of 1952 Allied contemplated an enlargement of its facilities which would require it to enter upon a lease for a period of fifteen years at a rental of $500 a month. The lessor desired some assurances as to the duration of Allied's franchises. Allied wrote Weber upon the subject and asked for a letter "setting forth the intended permanency of our franchise with you." In response Weber wrote in somewhat vague fashion but saying in part: "I know that your thinking and ours coincides in that we are all interested in building Choremaster (a Weber product trade name) year after year. That is exactly what you have done, and I wanted to take this opportunity to express my appreciation for your splendid cooperation. With the rapid expansion of the Choremaster line, i. e., tillers, mowers, we feel that our

volume, and that of our distributors, should grow from year to year in the future. I hope that we may have the pleasure of many more years of pleasant, profitable association."

Allied exhibited the foregoing letter to the intended lessor, and the lease was executed.

In September of 1953 Allied considered adding to its lines a cultivator made by the Quick Manufacturing Company. Weber considered this cultivator to be in competition with its product. Representatives of Weber and Allied conferred, and thereafter correspondence was exchanged. It clearly appeared from the notes of the conference and from the correspondence that, if Allied undertook to sell equipment which was in competition with Weber's equipment, the Weber distributorship would be terminated. Allied replied by wire that it would distribute certain competitive lines and assumed that this cancelled the distributorship with Weber. Allied commented, "We regret exceedingly that this decision is forced upon us." Thereupon the franchise was terminated and Weber immediately took over the territory and proceeded to distribute its products throughout Virginia through many of the dealerships which had been set up by Allied.

Litigation ensued, of which one phase is the subject matter of this appeal. Allied claimed from Weber damages in the amount of $75,000 for unlawful cancellation of its contract, and claimed further that the damages should be trebled on the ground that Weber's acts constituted a violation of the antitrust laws. Allied's claims were asserted in a counterclaim in a suit brought against it by Weber to collect on an open account, but we need not relate the details of the litigation. A jury, answering written interrogatories, assessed Allied's damages at $15,000 and found that Weber had violated the antitrust laws. Thereafter the District Court rendered judgment *n.o.v.* for Weber. The basis for the action of the District Court was its opinion that the contract between Weber and Allied was lacking in mutuality, was not enforceable, and could not be the basis for an award of damages for breach. This appeal followed.

The purported agreement or arrangement between Weber and Allied was not in writing. It is not claimed by either party that a time of duration was fixed, that prices or quantities were indicated, that obligations to buy or sell were undertaken, or that methods or times of delivery were prescribed. On the other hand, in so far as this appeal is concerned, it seems to be assumed by both parties that some arrangement amounting to an exclusive dealership in certain territory was made, that it existed from mid-1949 to late 1953, that an extensive system of dealerships was established by Allied for Weber products, and that Allied's lease of the new building was, in part at least, in reliance upon Weber's representations.

The first question in our consideration of the problem is whether the arrangement between Weber and Allied was such that its termination by Weber afforded Allied a cause of action for damages. The question is settled by the decision of this court in Jack's Cookie Company v. Brooks.[1] Judge Soper, writing for the court, said:

"On the other hand, if the manufacturer appoints an agent not merely to sell the goods, but the agent in addition to making sales furnishes additional consideration, as when he sets up a distributive system for the manufacturer's goods and his compensation is measured by the amount of goods sold in the territory assigned to him, the manufacturer is not at liberty to terminate the agreement at will even though it contains no provision for its termination, but must retain the agent in the employment for a reasonable period of time. [Citing authorities.]"[2]

1. 227 F.2d 935 (1955), certiorari denied, 351 U.S. 908, 76 S.Ct. 697, 100 L.Ed. — (1956).

2. Id., 227 F.2d at page 938.

It is perfectly true that generally speaking a distributorship arrangement such as this does not constitute the basis for suits on account of quantities, prices, terms, and such items; and, generally speaking, they are terminable by either of the parties.[3] In the Kirkmyer case,[4] for example, this court held that an oral promise of a dealership, in so far as it related to the sale of the manufacturer's products to the dealer, was lacking in mutuality and was too indefinite to form the basis for a binding obligation on the part of the manufacturer. In that case the dealer had a franchise and was located in West Richmond. The manufacturer wanted a dealer in South Richmond and told the dealer it must move or lose the franchise. The manufacturer also promised that if an additional dealership were placed in West Richmond this dealer would get it. The dealer moved, and later another concern was awarded a dealership in West Richmond. The franchise which the dealer had, and in respect to which he incurred the expense of moving, etc., was not cancelled. The basis of his suit was the failure to award him the other franchise, in respect to which he had made no expenditures. But that is not the problem in our case. Here we are faced with the claim of a distributor who is being deprived of the very franchise which he has built up, allegedly at great expense.

There is an exception to the general rule of which the Kirkmyer case is an expression. It is well settled that, where an employed agent, in reliance upon the agency and with the knowledge of his principal, expends funds in the interest of the agency and of the principal, the principal is committed to the agency for a reasonable period of time, so that the agent may thus recoup his expenditures. As Professor Williston says, "It is the settled law of agency that if the agent or employee furnishes a consideration in addition to his mere services, he is deemed to have purchased the employment for at least a reasonable period where the duration of the employment is not otherwise defined."[5]. This is the rationale of the opinion of this court in Jack's Cookie Company, supra, and it is applicable to the case at bar.

On this first question we hold therefore that, if, pursuant to an understanding with Weber, Allied expended sums of money in developing a distributorship system for Weber products throughout Virginia, it was entitled to the right of distributorship for such a period of time as would enable it to recoup these and any other expenditures which with the knowledge of Weber it incurred in reliance upon the arrangement. It follows that, if Weber, without sufficient cause, terminated the arrangement prior to the expiration of such a reasonable time, Allied was entitled to damages in the amount of its unrecouped expenditures, taking into account, of course, the value of any benefits it may have derived from the arrangement during its existence or may derive thereafter.

It seems to us that some measure of confusion crept into the briefs and argument in the discussions of notice of termination. The reasonable period which the law requires prior to termination of an agency under the rules we have been discussing is, of course, not the reasonable notice which the manufacturer must give if he has decided to, and properly may, terminate. In the present case Allied did not maintain that the notice of termination was insufficient or that lack of timely notice resulted in damages.

The facts recited in the foregoing discussion of the basic question of law are assumed for these purposes. If the case goes to retrial, some, or all, of them

---

3. Ford Motor Co. v. Kirkmyer Motor Co., 65 F.2d 1001 (4th Cir., 1933) ; Motor Car Supply Co. v. General Household Utilities Co., 80 F.2d 167 (4th Cir., 1935).

4. Ford Motor Co. v. Kirkmyer Motor Co., 65 F.2d 1001 (1933).

5. 4 Williston, Contracts § 1027A(3) (Rev. ed.1936). See also Restatement, Agency § 442, comment c (1933).

may be disputed and, if so, become questions for the jury. We have indicated that the existence of some arrangement between Weber and Allied is assumed upon this appeal. If that fact is an issue upon a trial, it is of course an issue of fact and is for the jury. There is evidence in the record that Allied did spend considerable amounts in reliance upon and furtherance of the Weber distributorship and that Weber knew of and tacitly approved the expenditures; whether those facts were established to the required extent was a jury question.

If it be found that an arrangement between Weber and Allied existed, and that pursuant to the arrangement Allied made expenditures, the jury should then decide whether the distributorship existed for a reasonable period of time, *i. e.*, sufficiently long for Allied to have recouped its expenditures.

■ In the testimony, and likewise in the briefs, circumstances other than the distributorship of the competitive product are discussed in connection with the termination of the arrangement. Such matters as falling sales of Weber equipment by Allied, failure of Allied to meet its obligations, and infirmities in Allied's credit are discussed. If this case is tried again, the jury, as we said in Jack's Cookie Company, should determine whether Allied faithfully and efficiently carried out its part of the business. If not, damages because of termination of the arrangement should not fall on Weber.

Another question which, if raised, would be a jury question is whether Allied agreed in its arrangement with Weber that it would not handle competitive products or whether, on the other hand, the arrangement contemplated that Allied was free to handle any and all other products. This is a question of fact. It is a material question, because, if the arrangement included an understanding that Allied would not handle competitive products, Allied and not Weber breached and thus terminated the arrangement when it undertook to distribute the competitive product. In such event Weber, of course, would not be liable for any damage consequent to the termination. On the other hand, if the arrangement contemplated that Allied might handle other products, including those competitive to Weber's, Weber's insistence upon a new agreement to the contrary and its insistence that Allied accept the new condition as a requisite to a continuance of the distributorship were in effect a termination of the prior arrangement. In such event the liability for the termination was upon Weber. What the arrangement was in respect to competitive products was a jury question.

■ The final question involves Allied's claim for treble damages arising out of Weber's alleged breach of the antitrust laws. It is Allied's contention that Weber, by attempting to use the threat of cancellation to force Allied to enter into an illegal exclusive-dealing contract, engaged in unfair competition which was the proximate cause of pecuniary damage to Allied. Under Section 3 of the Clayton Act,[6] upon which this claim is based, it is unlawful to enter into any lease, sale or contract which is conditioned upon the lessee's or purchaser's not dealing in the goods of a competitor, where the effect of such lease, sale or contract may be substantially to lessen competition or to create a monopoly. There can be no violation of the Act unless there is a contract, sale or lease.[7]

Allied faces a dilemma on the point. If there was no contract denying it the right to handle products competitive to Weber, there was no violation of the antitrust laws. If there was such a contract, as we have already pointed out the breach was by Allied and so no damages accrued to it.

6. 38 Stat. 731 (1914), 15 U.S.C.A. § 14.

7. Hunter Douglas Corp. v. Lando Products, 215 F.2d 372 (9th Cir., 1954); Nelson Radio & Supply Co. v. Motorola, 200 F. 2d 911 (5th Cir., 1952), certiorari denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953).

It follows from the foregoing that the judgment of the District Court must be set aside and the case remanded for a new trial if the parties are so minded.

Reversed and remanded.