480 F.2d 482
 1973-1 Trade Cases 74,390
 AG-CHEM EQUIPMENT CO., INC., a Minnesota corporation, Appellee,
v.
HAHN, INC., an Indiana corporation, and Kearney-National,
Inc., a Delaware corporation, Appellants.
AG-CHEM EQUIPMENT CO., INC., a Minnesota corporation, Appellant,
v.
HAHN, INC., an Indiana corporation, and Kearney-National,
Inc., a Delaware corporation, and Hahn, Inc., a
Delaware corporation, Appellees.
 Nos. 72-1152, 72-1199.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 8, 1973.
Decided March 6, 1973.
As Modified on Rehearing March 30, 1973.
 
 Veryl L. Riddle, Thomas C. Walsh, Daniel R. O'Neill, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for Hahn, Inc. of Indiana and Kearney National, Inc.
 James P. Larkin, Robert J. Hennessey, and Larkin, Hoffman, Daly & Lindgren, Minneapolis, Minn., for Ag-Chem Equipment Co., Inc.
 Martin Weinstein, Minneapolis, Minn., for Hahn, Inc. of Delaware.
 Before MATTHES, Chief Judge, BRIGHT, Circuit Judge and TALBOT SMITH, Senior District Judge.*
 MATTHES, Chief Judge.
 
 
 1
 The main controversy in this litigation is between Ag-Chem Equipment Co., Inc. (hereinafter referred to as Ag-Chem), a Minnesota corporation and plaintiff below, and Hahn, Inc., and Kearney-National, Inc., Indiana and Delaware corporations, respectively (hereinafter referred to collectively as Hahn), the original defendants in the trial court.[1]
 
 
 2
 A protracted jury trial involving numerous complex issues resulted in jury verdicts in favor of Ag-Chem against all defendants as follows:
 
 
 3
 $ 91,192.00 Violation of Robinson-Patman Act (illegal price and service discrimination)
 
 
 4
 (before trebling)
 
 
 5
 98,740.00 Breach of exclusive distributorship contract
 
 104,086.00 Recoupment
 
 6
 3,500.00 Malicious defamation of credit.
 
 
 7
 In response to Hahn's timely motion for judgment n. o. v., or in the alternative, for a new trial, the district court, 350 F.Supp. 1044, granted judgment n. o. v. on the exclusivity claim, ordered Ag-Chem to remit 80 percent of the Robinson-Patman damages,[2] and vacated the judgment against Hahn of Delaware, leaving undisturbed the defamation and recoupment verdicts. The court also awarded Ag-Chem $18,000 reasonable attorney fees allocable to the Robinson-Patman claim.
 
 
 8
 Neither Hahn nor Ag-Chem was satisfied with the final judgment as evidenced by their respective appeals. In No. 72-1152 Hahn has appealed the judgment in favor of Ag-Chem on the claims of defamation of credit, recoupment, and violation of the Robinson-Patman Act. In No. 72-1199 Ag-Chem has appealed the trial court's reduction of the Robinson-Patman verdict, the directed verdict in favor of Hahn on the Sherman Act price-fixing claim, the judgment n. o. v. in favor of Hahn on the exclusivity claim, and the dismissal of Hahn of Delaware.
 
 
 9
 Ag-Chem was organized in 1963, and is the corporate successor in interest to the sole proprietorship of Alvin E. McQuinn, president of Ag-Chem. Hahn, a manufacturer of specialty machinery for the application of all types of agricultural chemicals, entered into a written distribution sales agreement with McQuinn on November 1, 1962, granting McQuinn an exclusive one-year franchise to sell Hahn chemical spraying equipment in Minnesota. A second written agreement which expanded Ag-Chem's territory to include the northern part of Iowa was executed for fiscal year 1964.[3] Subsequently, the franchise was extended to cover all of Iowa. After expiration of the 1964 written agreement, the parties continued their relationship on an oral basis until Hahn terminated the distributorship in 1968. Ag-Chem and Hahn differ as to the actual date of termination, and we review the facts in this respect as a means of portraying the relationship between the parties prior to termination. The record shows that
 
 
 10
 on July 8, 1968, an authorized representative of Hahn by letter informed Ag-Chem:
 
 
 11
 ". . . I would . . . like to at this time serve notice of contract cancellation. We intend to cancel all previous contracts with Spray Centers and negotiate new agreements for the coming season.
 
 
 12
 We will make every effort . . . to show you that manufacturing as you are doing will only increase your overhead and decrease your profits in the long run. We feel it would be far more profitable for Ag-Chem and Hahn to have you as a sales organization only."
 
 
 13
 This letter provoked a lengthy response from Ag-Chem protesting the recent decision made by Hahn to sell its equipment to Allis-Chalmers Manufacturing Co., a nationwide distributor of agricultural equipment with dealers situated in the Ag-Chem territory.
 
 
 14
 Finally, by letter of December 18, 1968, Hahn informed Ag-Chem:
 
 
 15
 "You have been critical of our trailer sprayer and, as a result, built your own. You are now in the process of building and merchandising your own self propelled sprayer. You are no longer promoting and selling our full line of equipment as was originally agreed.
 
 
 16
 On July 8, 1968, Jim Niemeier wrote a letter cancelling Hahn's sales agreement with Ag-Chem Equipment Company. The letter also mentioned renegotiations of a new contract. Our negotiations have been in vain; so, we have decided to establish new distribution for the territory.
 
 
 17
 We realize that you may still have some sales prospects and commitments; therefore, as a convenience to you, we will continue to take orders from you for agricultural product equipment which we are now manufacturing . . . up to March 1, 1969."
 
 
 18
 From the foregoing we conclude the franchise agreement was cancelled on July 8, 1968, subject to further negotiations; that negotiations were not productive, and on December 18, 1968, the arrangement was formally terminated, effective March 1, 1969.
 
 
 19
 This lawsuit was instituted by the filing of the original complaint on September 11, 1969. The complaint was amended several times before and during course of trial.[4] Hahn stood on its motion for directed verdict made at close of Ag-Chem's case, offered no evidence, and the jury returned the verdicts set forth above.
 
 I. APPEAL NO. 72-1152
 A. Recoupment
 
 20
 The doctrine of recoupment is designed to remedy the inequity which arises when a manufacturer, after having required a distributor to make a sizeable investment in the furtherance of a distributorship, terminates the working relationship without just cause, leaving the distributor with substantial unrecovered expenditures.
 
 
 21
 Recoupment appears to have evolved from the principle that, if an agent or employee of the principal or employer furnishes a consideration in addition to his mere services, he will be deemed to have purchased the employment for at least a reasonable period of time where the duration of the employment is not otherwise defined. Gellhorn, Limitations on Contract Termination Rights-Franchise Cancellations, 1967 Duke L.J. 465, 479; 9 Williston, Contracts Sec. 1017A (3rd ed. 1967); Restatement (Second) of Agency Sec. 442, comment c (1957). Employing this rationale, a number of courts have declared that a manufacturer would be in breach and liable for damages should he terminate the distributorship contract without just cause before a reasonable period of time had lapsed. Allied Equipment Co. v. Weber Engineered Products, Inc., 237 F.2d 879 (4th Cir. 1956); Jack's Cookie Co. v. Brooks, 227 F.2d 935 (4th Cir. 1955), cert denied, 351 U.S. 908, 76 S.Ct. 697, 100 L.Ed. 1443 (1956). See cases collected in Annot., 19 A.L.R.3d 196, 319 (1968). The purpose of allowing a reasonable time for the contract is to provide the distributor with a reasonable opportunity to recoup his expenditures. Allied Equipment Co. v. Weber Engineered Products, Inc., supra, 237 F.2d at 882. What period of time is, in fact, "reasonable" varies with the circumstances of each case. General Tire and Rubber Co. v. Distributors, Inc., 253 N.C. 459, 117 S.E.2d 479, 489 (1960).
 
 
 22
 Other courts have reached the same or a similar result, while still holding that the contract remains terminable at will, by requiring the manufacturer to reimburse the distributor in quantum meruit for unrecouped expenses.[5] Gibbs v. Bardahl Oil Co., 331 S.W.2d 614 (Mo. 1960); Beebe v. Columbia Axle Co., 233 Mo.App. 212, 117 S.W.2d 624 (1938). See cases collected in Annot., 19 A.L.R.3d 196, 312 (1968).
 
 
 23
 This court in Clausen & Sons Inc. v. Theo. Hamm Brewing Co., 395 F.2d 388, 391 (8th Cir. 1968), construing Minnesota law, adopted the former of these approaches as follows:
 
 
 24
 "Thus we feel that under Minnesota law where an exclusive franchise dealer under an implied contract, terminable on notice, has at the instance of a manufacturer or supplier invested his resources and credit in establishment of a costly distribution facility for the supplier's product, and the supplier thereafter unreasonably terminates the contract and dealership without giving the dealer an opportunity to recoup his investment, a claim [for breach of contract] may be stated."
 
 
 25
 A review of the authorities on recoupment makes it clear that a threshold requirement to the right is the existence of an agreement which is terminable at will. Under Minnesota law, as is generally true elsewhere, a contract having no definite duration is terminable at will by either party upon reasonable notice to the other. McGinnis Piano & Organ Co. v. Yamaha Int'l Corp., 480 F.2d 474 (8th Cir. 1973);* Benson Coop. Creamery Ass'n v. First District Ass'n, 276 Minn. 520, 151 N.W.2d 422, 426 (1967); Victor Talking Machine Co. v. Lucker, 128 Minn. 171, 150 N.W. 790, 792 (1915).
 
 
 26
 As we understand Hahn's position on this appeal, it does not dispute the right of one whose distributorship has been cancelled without cause to recoup his investment. Instead, Hahn argues that, on the record before us, no evidentiary basis exists for the award of such damages to Ag-Chem. Hahn premises its argument on three grounds: (1) the evidence failed to establish the amount of Ag-Chem's investment and that such investment had been made at the insistence of Hahn; (2) the evidence showed conclusively that Ag-Chem had been afforded a reasonable time in which to recoup; and (3) the termination of the distributorship was, as a matter of law, justified and not unreasonable.
 
 
 27
 Recoupment has traditionally been confined to the recovery of preliminary expenses incurred in setting up a distributorship system, such as sums expended for initial promotion and renting a facility. Thus the doctrine has envisioned a distributorship requiring one, large, initial investment. Bushwick-Decatur Motors, Inc. v. Ford Motor Co., 116 F.2d 675, 676 (2d Cir. 1940).
 
 
 28
 Prof. Gellhorn, in a discussion of the doctrine of recoupment, has observed:
 
 
 29
 "The rules of reasonableness, in other words, protect a dealer only against sudden terminations (that is, against losses which might be averted upon reasonable advance notice) and, if the contract is silent, against terminations shortly after the agreement was executed. As a practical matter the protection provided by these implied conditions is minimal. . . . In addition, no court appears to have extended the doctrine of reasonableness to give the dealer an opportunity to recoup any new investment, regardless of when made."
 
 
 30
 Gellhorn, supra at 482.
 
 
 31
 Prof. Gellhorn concluded his discussion by suggesting inter alia that recoupment be extended to the recovery of new investments. Id. at 513 n. 179.
 
 
 32
 We find that the evidence viewed in the light most favorable to Ag-Chem provides sufficient proof of a continual investment made in the establishment and development of the Hahn distributorship. In addition, the evidence warrants the inference that Hahn not only countenanced but actively encouraged the expenditures made by Ag-Chem. We are of the view, however, that the trial court erroneously admitted evidence as to the amount of the investment. We discuss that matter more fully in consideration of Hahn's alternative motion for a new trial.
 
 
 33
 Hahn's second argument in support of the alleged insufficiency of the evidence, that Ag-Chem had had more than a reasonable opportunity to recover its investment prior to termination, presents a troublesome question as Ag-Chem had enjoyed the franchise and emoluments flowing therefrom from 1962 through 1968. Nonetheless, in view of the fact that the distributorship required a continual investment, we are not persuaded to rule as a matter of law that it had endured for a reasonable time. See McGinnis Piano & Organ Co. v. Yamaha Int'l Corp., supra.
 
 
 34
 Hahn's last argument in support of the insufficiency of the evidence is that the distributorship was terminated for just cause. Again, we disagree. As we read this record, whether or not the distributorship was terminated for just cause was a dominant and highly controversial issue in the trial. Hahn claimed that it terminated the relationship because Ag-Chem had entered into competition with Hahn by manufacturing and marketing its own sprayer equipment. Ag-Chem, on the other hand, contended that the termination resulted from a personal animosity between the parties over Hahn's designation of Allis-Chalmers as a distributor in the same geographical area served by Ag-Chem. Certainly there was evidence which would have warranted the jury in finding that the contract was terminated for good cause. However, the issue was clearly disputed, the jury resolved the conflict in favor of Ag-Chem, and we are not authorized to upset that finding.
 
 
 35
 Alternatively, Hahn contends that it is entitled to a new trial on the recoupment claim because of the erroneous and prejudicial admission of evidence of the "future value of current expenses" and the highly conjectural nature of the proof of damages.
 
 
 36
 Ag-Chem premised its claim for recoupment on the theory that it was entitled to recover that unamortized portion of operating expenses incurred in the fiscal years 1964-1968 which was attributable to future development. This theory was explained by a professor of economics who testified for Ag-Chem as follows:
 
 
 37
 "To the degree that any expenditure has an effect on reducing costs in subsequent years, it is an asset of the firm in the year in which that expenditure was made. If, as is the [sic] case, advertising expenditures made this year have an effect not just on this year's sales, but also on sales in subsequent years, a portion of this year's advertising expense . . . is a capital asset of the firm, not an expense of the current year's operations. This despite the fact that accountants invariably write off advertising as an expense rather than capitalizing it."
 
 
 38
 Mr. McQuinn determined through some indefinable process the future value of fifteen categories of operating expenses. Plaintiff's exhibit 71 represented his allocation of operating expenses to future development for the years 1964-1968.[6] Based upon the information contained in exhibit 71, Ag-Chem's accountant prepared exhibit 63 showing the capitalization and amortization of those operating expenses allocated to future development.[7] The unamortized portion remaining as of September 30, 1968, alleged to be Ag-Chem's unrecouped investment, was $104,086, the exact amount of the jury verdict on the recoupment claim.
 
 
 39
 We agree with Hahn that Ag-Chem's proof of damages failed to take into account several vital considerations, and for that reason we remand to the trial court for a new trial.
 
 
 40
 In the Allied Equipment case, supra, 237 F.2d at 882, the recoupment doctrine was stated as follows:
 
 
 41
 "[I]f [the manufacturer], without sufficient cause, terminated the arrangement prior to the expiration of such a reasonable time, [the distributor] was entitled to damages in the amount of its unrecouped expenditures, taking into account, of course, the value of any benefits it may have derived from the arrangement during its existence or may derive thereafter."
 
 
 42
 In its proof of damages Ag-Chem ignored the fact that it had realized net profits after taxes over the 1964-1968 period of $98,240.[8] The existence of substantial profits may very well indicate that the expenditures made by Ag-Chem were substantially amortized through the production of realized profits during the operation of the distributorship. See C. C. Hauff Hardware, Inc. v. Long Manufacturing Co., 260 Iowa 30, 148 N.W.2d 425, 428 (1967); cf. Smith v. Onyx Oil & Chemical Co., 218 F.2d 104, 112 (3d Cir. 1955). See also Note, Measure of Damages Resulting from Breach of Distributorship Agreements, 2 Ind.Legal F. 316 (1969). Accordingly, on retrial the court should frame its instructions to authorize the jury to award Ag-Chem its unamortized capital investments, if any, in accordance with the guidelines herein delineated.
 
 
 43
 Secondly, insofar as we are able to determine from this record, the percentages of operating expenses charged to future development in exhibit 71 were attributed wholly to the development of the Hahn distributorship. Yet, during the latter part of that period, particularly 1967 and 1968, Ag-Chem was actively engaged in manufacturing, promoting, and distributing its own sprayer equipment. According to plaintiff's exhibit 35, Ag-Chem's net sales in 1967 of equipment manufactured by itself or some company other than Hahn totaled $67,327. In 1968, these sales rose to $176,785. According to plaintiff's exhibit 61, in the years 1969 and 1970, after termination of the Hahn distributorship, Ag-Chem realized gross sales of its own equipment and parts of $813,471 and $872,444, respectively.[9]
 
 
 44
 Thus it appears irrefutable that Ag-Chem itself derived substantial benefits both in the years prior to and after termination of the Hahn distributorship from those operating expenses attributable to future development. Therefore, in the event of another trial, evidence of unamortized capital expenses should be confined to that portion which served to promote and develop the Hahn distributorship alone.
 
 
 45
 We add a cautionary note as to proof of operating expenses attributable to future development. Although we are inclined to agree with Ag-Chem's Professor Mohring that certain everyday expenditures, such as advertising or salesmen's salaries, may under certain circumstances be in the nature of a capital investment, regardless of treatment for tax purposes, more proof is required than the mere assertion of a company official that this is the case. We visualize particular difficulty in adequately proving the investment value of several of Mr. McQuinn's categories of operating expenses, for example, "office supplies," "postage," "legal and audit," and "telephone."
 
 B. The Robinson-Patman Claim
 
 46
 Hahn sold its equipment to Allis-Chalmers at a 55 percent discount off list price. Allis-Chalmers resold exclusively to its dealers at an approximate discount of 25 percent. In contrast, from September, 1967, until the effective date of termination, Ag Chem purchased Hahn products at an approximate discount of 45 percent. Ag-Chem resold largely to fertilizer, chemical and feed dealers who purchased Hahn sprayers for their own use in custom spraying. An undetermined percentage of these customers-one witness testified to 20 percent or less-acted as stocking dealers for Ag-Chem. Ag-Chem granted to stocking dealers a 15 percent discount between September 1967 and March of 1969.
 
 
 47
 Ag-Chem contended in the trial court that the more favorable discount granted to Allis-Chalmers constituted a price discrimination prohibited by Sec. 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. Sec. 13(a).[10]
 
 Section 2(a) reads in part:
 
 48
 "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. . . ."
 
 
 49
 As readily appears from a reading of the statute, evidence of the existence of competition is essential for a violation of the Robinson-Patman Act. 1 R. Callman, The Law of Unfair Competition Sec. 28.1(b)(7) (3rd ed. 1967). The existence of this competition is essentially a fact question which can only be determined by making a realistic appraisal of all the relevant competitive facts. FTC v. Sun Oil Co., 371 U.S. 505, 527, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963). Ag-Chem urged that the requisite competition existed either at the secondary level, between Ag-Chem and Allis-Chalmers, or at the tertiary level, between dealers of each.
 
 
 50
 The Robinson-Patman claim was submitted to the jury along with the following instruction concerning measure of damages:
 
 
 51
 "The measure of damages for such unlawful price discrimination is the product of the dollar amount of units and parts purchased by Ag-Chem times the amount of the price discrimination."
 
 
 52
 The jury arrived at a verdict of $91,192, which sum was in accordance with the court's instruction on damages and plaintiff's exhibit 81.
 
 
 53
 As the trial court recognized in its post-verdict memorandum opinion, the instruction on damages failed to take into account the degree of actual competition between Ag-Chem and Allis-Chalmers or their dealers, stating:
 
 
 54
 "When examined, it is apparent that Allis-Chalmers sold to customers which were completely unavailable to plaintiff. Allis-Chalmers never received a penny from a customer to which Ag-Chem could have sold, nor did it even deliver title to such a customer. Indeed, on the contrary, it sold to a closed class of purchasers, its own dealers, to whom Ag-Chem had no access whatsoever. . . .
 
 
 55
 Finding that, as a matter of law, Allis-Chalmers and Ag-Chem did not compete with each other necessarily makes the instructions to the jury improper."
 
 
 56
 Instead of granting a new trial, however, the court "in light of the time and expense already expended," remitted 80 percent of the jury's verdict on the ground that "the evidence was such that the jury could have concluded that up to 20 percent of plaintiff's business was with dealers who were in direct competition with Allis-Chalmers dealers."
 
 
 57
 We appreciate the trial court's reasons for granting remittitur. However, as we are remanding this case for a new trial on the issue of recoupment, we believe it to be in the best interests of the parties to allow the Robinson-Patman claim to be relitigated also. The question of the existence of competition, much less the extent, was vigorously disputed in the trial court. We cannot determine what effect the erroneous instruction may have had on the jury's verdict. Moreover, there is scant evidence in this record to show what percentage of Ag-Chem's customers in fact acted as stocking dealers.
 
 
 58
 By our foregoing discussion, we also dispose of Ag-Chem's contention on its cross-appeal that the trial court erred in reducing the Robinson-Patman verdict on the ground that, as a matter of law, Allis-Chalmers and Ag-Chem did not compete directly with one another.
 
 C. Defamation of Credit
 
 59
 We affirm the judgment of the trial court entered in favor of Ag-Chem on the claim of malicious defamation of credit.
 
 
 60
 Ag-Chem claimed that Hahn had maliciously, willfully and falsely reported to Dun & Bradstreet that Ag-Chem was delinquent in the payment of a Hahn account, knowing that Dun & Bradstreet would publish such information. The evidence disclosed that an agent of Hahn had made the report to Dun & Bradstreet and that it was indeed published.
 
 
 61
 The trial court fully considered Hahn's post-trial attack against the jury verdict and held that the evidence considered in the light most favorable to Ag-Chem was sufficient for the jury to conclude that Hahn had knowingly made the false statement with the intent that it be published. Accordingly, the court was not inclined to disturb the jury's verdict awarding Ag-Chem $3,500 as punitive damages. Neither are we convinced that the judgment for that amount should be set aside or a new trial granted on that issue. Minnesota law recognizes that a false statement of an overdue account, as alleged here, may be defamatory per se, thereby justifying punitive damages in the absence of proof of actual damages. Northwestern Detective Agency v. Winona Hotel Co., 147 Minn. 203, 179 N.W. 1001 (1920).
 
 II. APPEAL NO. 72-1199
 A. Exclusivity
 
 62
 As noted at the outset, Ag-Chem has appealed from the judgment n. o. v. entered in favor of Hahn on the exclusivity claim.
 
 
 63
 Ag-Chem argued in the trial court that the oral agreement with Hahn provided that Ag-Chem would be the exclusive distributor of Hahn equipment in the Minnesota and Iowa territory so long as Ag-Chem continued to promote the Hahn line. Ag-Chem further argued that the exclusive distributorship term of their agreement was breached by Hahn's sale to Allis-Chalmers and the subsequent distribution by Allis-Chalmers in the territory of Minnesota and Iowa. As a means of proving damages, Ag-Chem introduced into evidence an exhibit prepared by its accountant which reflected the average annual earnings of Ag-Chem for the fiscal years 1964-1968. Average annual earnings multiplied by five, the minimum number of years Ag-Chem contemplated the distributorship would have remained in existence, resulted in an alleged loss of future profits in the sum of $98,740, the exact amount of the jury verdict.
 
 
 64
 The trial court, in its posttrial memorandum and judgment, concluded that the contract was one terminable at will and that Minnesota law does not prohibit termination by one who has already breached the contract. As a consequence, damages incurred after termination, including lost profits, were not recoverable. On these grounds, the court set aside the exclusivity verdict and granted judgment n. o. v. in favor of Hahn.
 
 
 65
 We agree with the trial court's conclusion. See Western Oil & Fuel Co. v. Kemp, 245 F.2d 633 (8th Cir. 1957); Benson Coop. Creamery Ass'n v. First District Ass'n, supra, 151 N.W.2d at 427; Annot., 19 A.L.R.3d 196 (1968); 17 Am. Jur., Contracts, Sec. 486 (1964). If, indeed, the contract was not terminable at will, we entertain serious misgivings as to the applicability of the doctrine of recoupment.[11] See Clausen & Sons v. Theo. Hamm Brewing Co., supra, 395 F.2d at 391.
 
 B. Sherman Act Claim
 
 66
 In passing upon the several motions for directed verdict filed by Hahn at the close of Ag-Chem's presentation of evidence, the trial court, without any statement of reasons, granted Hahn's motion "[w]ith respect to the Section 1 Sherman Act claim."
 
 
 67
 On March 9, 1972, the final judgment was entered. Neither that judgment nor any other entered previously thereto adjudicated the Sherman Act claim. And we note in passing that the notice of appeal was "[f]rom the court's order directing a verdict against plaintiff on the Sherman Act price-fixing claims."
 
 
 68
 We recognize that the order granting the motion for a directed verdict is effective without the assent of the jury. Rule 50(a), Fed.R.Civ.P. However, proper judicial procedure dictates that whenever the trial court grants a motion for a directed verdict, a formal judgment disposing of the issue should be entered, and the appeal taken from that judgment. See Goecke v. Schoel, 257 Iowa 504, 132 N.W.2d 481 (1965); 4 Am.Jur.2d, Appeal and Error Sec. 110 (1962).
 
 
 69
 The hiatus in the record notwithstanding, we have examined the merits of Ag-Chem's claim of error,[12] and find no basis for interfering with the action of the trial court.
 
 
 70
 Ag-Chem's Sherman Act claim was based upon the theory that Hahn and Allis-Chalmers conspired to reduce the discount previously awarded to Hahn distributors in order that Allis-Chalmers dealers could better compete.
 
 
 71
 The weakness of Ag-Chem's position appears to be the insufficiency of the evidence to prove the fact of injury and the amount of injury. See Bigelow v. RKO Radio Pictures, 327 U.S. 251, 263, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Household Goods Carriers' Bureau v. Terrell, 452 F.2d 152 (5th Cir. 1971); Dean Foods Co. v. Albrecht Dairy Co., 396 F.2d 652 (8th Cir. 1968); McCleneghan v. Union Stock Yards of Omaha, 349 F.2d 53 (8th Cir. 1965). Of course, the amount of damage need not be proven by specific or exact evidence, once the fact of injury has been clearly established. Here Ag-Chem failed to prove either, and the trial court correctly directed a verdict in favor of Hahn.
 
 C. Dismissal of Hahn of Delaware
 
 72
 Hahn of Delaware, the transferee of the Kearney-National interest in the Hahn line of sprayer equipment, did not come into existence until after commencement of this action. It was joined as a party defendant on February 19, 1971, shortly before the trial commenced.
 
 
 73
 The trial court vacated the judgment as to Hahn of Delaware on the ground that "Kearney-National is a financially responsible corporation, able to respond to the judgment obtained in this action. . . ."
 
 
 74
 Ag-Chem does not object to the dismissal of Hahn of Delaware if Kearney-National is in fact a financially responsible corporation. However, Ag-Chem takes the position that the trial court should have reserved to Ag-Chem the right to reopen in the event Kearney-National proves unable to respond to the judgment.
 
 
 75
 A corporate annual report filed with the court shows that as of December 31, 1969, Kearney-National had a net worth of $15,091,465. Nothing appears in Ag-Chem's brief or in the record which would cause us to interfere with the judge's dismissal of Hahn of Delaware.
 
 III. SUMMARY
 
 76
 To summarize, we vacate the judgment in favor of Ag-Chem on the recoupment and Robinson-Patman Act claims and remand the case to the district court for a new trial. All issues shall be retried on the Robinson-Patman Act claim, but the trial on the recoupment claim shall be limited to the amount of damages, if any, sustained by Ag-Chem.
 
 
 77
 We also vacate the judgment of $18,000 attorney fees awarded for services rendered in connection with the Robinson-Patman claim. The vacation of the allowance for attorney fees is without prejudice to the district court's awarding of such fees in an appropriate amount in the event Ag-Chem succeeds on the Robinson-Patman claim in another trial.
 
 
 78
 In all other respects, the judgment of the district court is affirmed. The costs incurred in these appeals shall be borne equally by Ag-Chem and Hahn of Indiana. No costs shall be taxed against Hahn of Delaware.APPENDIX A
 
 PLAINTIFF'S EXHIBIT 71
 
 79
 AG-CHEM EQUIPMENT CO., INC.
 
 ALLOCATION OF OPERATING EXPENSES TO FUTURE
 DEVELOPMENT
 YEAR ENDING SEPT. 30, 1964
 
 80
 Total Operating % Attributable Net Charged
 Expenses per to Future to Future
 Audited Statement Development Development
Officer's salary $18,000.00 30% $ 5,400.00
Salesmen's salary 6,500.00 20% 1,300.00
Office salary 2,378.00 20% 475.60
Commissions 18,396.00 20% 3,679.20
Business Promotion 1,131.00 20% 226.20
Travel 2,320.00 20% 464.00
Telephone 2,927.00 20% 585.40
Auto 2,307.00 20% 461.40
Advertising 2,331.00 70% 1,631.70
Office Supplies 972.00 20% 194.40
Postage 135.00 10% 13.50
Legal & Audit 1,509.00 50% 754.50
Dues & Contributions 170.00 25% 42.50
Amort. of Org. Exp. 91.00 20% 18.20
Meeting Expense 476.00 30% 142.80
 -----------
Total $15,389.40
 
 APPENDIX B
 PLAINTIFF'S EXHIBIT 63
 
 81
 AG-CHEM EQUIPMENT CO., INC.
 
 CAPITALIZATION AND AMORTIZATION OF EXPENSES
 
 82
 CAPITALIZED
 Unamortized Amortization
 Total Portion at Year Ended September 30,
 Capitalized 9-30-68 1968 1967 1966 1965 1964
Expenses $ 15,389 $ 3,077 $ 3,0- $ 3,0- $3,078 $3,078
 Capitalized 78 78
 Year Ended
 9-30-64
Expenses 25,851 10,341 5,170 5,170 5,170
 Capitalized
 Year Ended
 9-30-65
Expenses 33,939 20,363 6,788 6,788
 Capitalized
 Year Ended
 9-30-66
Expenses 45,402 36,322 9,080
 Capitalized
 Year Ended
 9-30-67
Expenses 33,983 33,983
 Capitalized
 Year Ended
 9-30-68
 ----------- ----------- ------ ------ ------ ------ ----
 $154,564 $104,086 $24,1- $15,0- $8,248 $3,078 $..
 16 36
 ----------- ----------- ------ ------ ------ ------ ----
 ----------- ----------- ------ ------ ------ ------ ----
 
 
 
 *
 Eastern District of Michigan, sitting by designation
 
 
 [1]
 Allis Chalmers Manufacturing Co., a Delaware Corporation, was also named as a defendant in the first and second amended complaints. However, before trial, Allis-Chalmers entered into a settlement agreement with Ag-Chem for $13,500 and was dismissed from the case. The trial court ordered the subsequent Robinson-Patman verdict against Hahn reduced by the amount received in the Allis-Chalmers settlement
 Hahn of Indiana was merged with Kearney-National in February of 1969, the latter corporation assuming all of the debts and liabilities of the former. There-after, the Hahn business was conducted as a division of Kearney. In December of 1970, after commencement of this action, Kearney disposed of the assets of the Hahn division to a new corporation, Hahn of Delaware. On February 19, 1971, the trial court granted Ag-Chem's motion to join Hahn of Delaware as a party defendant in order to insure the necessary equitable relief requested in the complaint.
 
 
 [2]
 The trial court initially gave Ag-Chem a choice between a new trial and acceptance of the remittitur. Subsequently, the court acceded to Ag-Chem's request that the order for judgment be amended to allow Ag-Chem to file acceptance of the remittitur under protest and without prejudice to its right to appeal
 
 
 [3]
 During all times relevant, both Ag-Chem's and Hahn's fiscal year began on October 1 and ended on September 30
 
 
 [4]
 Aside from the claims submitted to the jury, Ag-Chem had also asserted: (1) a violation of Sec. 2 of the Sherman Act (attempt to monopolize and control a substantial portion of interstate commerce in agricultural spraying equipment in the states of Minnesota and Iowa); (2) wrongful inducement of an Ag-Chem employee to leave Ag-Chem's employ and enter the employ of Hahn; and (3) breach of an agreement that the distributorship would not be terminated so long as Ag-Chem continued to promote the Hahn line. Ag-Chem apparently abandoned the first two claims prior to trial. The trial court directed a verdict in favor of Hahn on the third claim, and Ag-Chem has not appealed that determination
 Hahn filed a counterclaim for patent infringement which was dismissed by stipulation of the parties prior to filing of the final judgment.
 
 
 [5]
 Whether the contract is determined to be terminable at will or for a reasonable duration, the distributor is usually entitled to reasonable notice of termination. See C. C. Hauff Hardware v. Long Manufacturing Co., 257 Iowa 1127, 136 N.W.2d 276 (1965); 19 A.L.R.3d 196, 292, 345 (1968). In the present case, Ag-Chem did not dispute in the trial court, and does not dispute here, the sufficiency of the notice of termination
 
 
 *
 Opinion filed simultaneously with this opinion
 
 
 [6]
 In order to facilitate understanding of the method used to arrive at an estimation of Ag-Chem's unrecouped investment, we reproduce in Appendix A to this opinion that part of exhibit 71 devoted to fiscal year 1964. The itemization made for 1964 is identical to the itemizations made for subsequent years except as to the amounts of the operating expenses and a fortiori the net charged to future development
 
 
 [7]
 Exhibit 63 is reproduced in Appendix B to this opinion. The exhibit was prepared by Ag-Chem's accountant approximately six weeks before trial solely for the purpose of proving damages. None of the figures appearing in exhibits 71 and 63, apart from the total operating expenses per audited statement, were recorded on the company books or included in annual financial statements. Total operating expenses were deducted on the corporate tax return as business expenses
 
 
 [8]
 Mr. McQuinn had drawn an officer's salary during the same five-year period aggregating $122,500
 
 
 [9]
 Although gross sales in 1969 and 1970 of its own equipment rivaled its gross sales of Hahn equipment in the previous years, Ag-Chem suffered relatively heavy losses in 1969 and 1970 due to greatly increased manufacturing costs
 
 
 [10]
 Ag-Chem also alleged that Hahn had violated Sec. 2(e) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. Sec. 13(e), by discriminating in services between Ag-Chem and Allis-Chalmers. That issue was submitted to the jury along with the question of price discrimination and the jury rendered a general verdict on both claims
 
 
 [11]
 Ag-Chem in its brief appears to acknowledge the inconsistency of its exclusivity and recoupment claims:
 "Ag-Chem raised the exclusivity verdict on this appeal only because it felt that if for any reason this court found the recoupment verdict could not be sustained, this court should then deal with the question of whether the law provides any remedy for plaintiffs such as Ag-Chem. . . .
 Our position is simply, that either this wrong must be remedied under the theory of recoupment or that this court should review the traditional rule that indefinite contracts are terminable at will."
 
 
 [12]
 Hahn does not dispute the appealability of the order directing a verdict on the Sherman Act claim