**M. C. MANUFACTURING COMPANY, INC., et al., Plaintiffs-Appellees,**

v.

**TEXAS FOUNDRIES, INC., et al., Defendants-Appellants.**

No. 74–2246.

United States Court of Appeals, Fifth Circuit.

Aug. 21, 1975.

Rehearing Denied Nov. 12, 1975.

James R. Cornelius, Jr., Lufkin, Tex., B. J. Bradshaw, Houston, Tex., Thomas

W. Hathaway, Tyler, Tex., for defendants-appellants.

Jim Ammerman, Marshall, Tex., Jack Price, Longview, Tex., for plaintiffs-appellees.

Before GOLDBERG, CLARK and GEE, Circuit Judges.

CLARK, Circuit Judge:

Plaintiffs, M. C. Manufacturing Company, Inc. (M.C.), and its wholly-owned subsidiary, Universal Automatic Machine Company, Inc. (Universal), initiated this private antitrust action against defendants, Texas Foundries, Inc. (Texas Foundries) and H/R Products, Inc. (H/R), alleging that the defendants conspired to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, through the utilization of a price discrimination scheme which also was violative of Section 2 of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a & f). Trial to a jury resulted in a general verdict for plaintiffs of $73,000.00 which was then trebled by the trial court to $219,000.00. Texas Foundries and H/R petition this court for relief from the judgment entered pursuant to that award. We reverse.

Universal alleges that this controversy arose while it and H/R were actively competing for a December, 1971 government contract to supply a finished military hardware item known as a Type "G" lifting plug,[1] because Texas Foundries quoted H/R a lower price than it quoted Universal to supply the required unfinished plug castings.[2] According to

---

1. The Type "G" lifting plug is a malleable iron device which the military services use to lift 155 mm. artillery projectiles. The lifting plug has a loop at one end, known as the "bail," and is threaded on the other end for insertion into the nose of an unfused artillery projectile, thereby facilitating the movement of such projectiles. When a projectile is to be fired, the lifting plug is removed and replaced by an appropriate fuse. Because their purpose is use with large caliber munitions, the only end-user market for lifting plugs is the military arm of the United States government.

2. The term "unfinished plug casting" refers to a basic casting made by a foundry which has not been machined and threaded into its final form as a lifting plug which will meet contract specifications.

plaintiffs, H/R and Texas Foundries clandestinely agreed by telephone on the 29th of November, 1971, to a price of 31 cents per unfinished plug casting delivered to H/R's plant (South Bend, Indiana). Texas Foundries had quoted Universal a price of 32.5 cents f.o.b. Texas Foundries' plant (Lufkin, Texas) only 11 days earlier, on the 18th of November. Plaintiffs assert that the price discrepancy between the two offers was the result of a conspiracy between Texas Foundries and H/R in violation of Section 1 of the Sherman Act aimed at the destruction of Universal as a competitor. They further assert that the ultimate sale to H/R of a portion of the castings required to perform the contract at the lower price constituted a violation of the Robinson-Patman Act's proscription of price distinctions between purchasers since on November 12, 1971, Texas Foundries and Universal had entered into a subcontract at 32.5 cents per casting to fulfill a prior government contract award to Universal.[3]

For their part, the defendants contend that Texas Foundries' agreement to sell to H/R at a lower price was reached after the December, 1971 contract had been awarded and then only after H/R's intended suppliers communicated to H/R that they could not satisfy H/R's requirements. They further contend the price reduction by Texas Foundries was intended to meet the price offered by H/R's other suppliers and to find a market for a substantial overage of castings which had been produced under Texas Foundries' preexisting contract with Universal.[4]

Because the particular facts underlying this case are crucial to our resolution of the controversy, a detailed review of the events leading to selection of a contractor on government contract No. DAAA–09–72–C–0208 is warranted.

On October 27, 1971, the Ammunition Procurement Supply Agency (APSA) distributed a solicitation inviting bids on a contract to supply 1,984,006 Type "G" lifting plugs. A total of 159 prospective bidders were solicited, of which 16, including Universal and H/R, ultimately submitted bids.

Upon receiving a solicitation from the APSA, Universal asked Texas Foundries to bid on a subcontract to supply unfinished plug castings. On November 18, 1971, Texas Foundries responded with a 32.5-cent per casting price, f.o.b. Texas Foundries' plant. Based upon Texas Foundries' quotation for the unfinished plug, Universal submitted a final bid to APSA of 49.28 cents per finished plug. During the time prior to opening of bids, Texas Foundries was also called upon by several other potential bidders to give similar casting price quotations. As a result, Texas Foundries sent written quotations to both Deco Grand, Inc., an uninvolved third party, and H/R containing the identical price quoted Universal, i. e., 32.5 cents per casting, f.o.b. Texas Foundries' plant.

The sixteen bids ultimately received on the APSA contract were opened on December 3, 1971, revealing that H/R was the low bidder at 47.6 cents per casting, Land-Air, Inc. was second at 48.8 cents per casting, and plaintiff, Universal, was the third lowest bidder at 49.28 cents per casting. Pre-award surveys and cost evaluations[5] were then conducted on the lowest group of bid-

---

3. Universal had been successful on June 16, 1970 in bidding on a similar government contract. This award to Universal was for 2,033,-950 plugs with an "add-on" award of 450,000, plus a negotiated addition of 750,000 plugs.

4. Universal purchased approximately 1,500,000 unfinished plugs from Texas Foundries while fulfilling its 1970 contract with add-ons and additions.

5. The pre-award survey involves government assessment of such factors as a bidder's financial status, production capability, technical capability, plant facilities and quality assurance capabilities; while the cost evaluation takes into account such factors as transportation costs, a bidder's use of government-owned equipment or facilities and discounts. That bidder who is shown to have the bid which evaluates lowest along with a feasible pre-

ders.[6] These studies resulted in evaluated bids (lowest cost to government) of 47.362 cents per plug for H/R, 48.678 cents per plug for Land-Air, Inc. and 49.107 cents per plug for Universal. Having thus entered the lowest evaluated bid and having received a satisfactory pre-award survey analysis, H/R was awarded the contract on December 30, 1971.

## SHERMAN ACT CLAIM

At trial plaintiffs' evidence tended to show a discriminatory pricing conspiracy between Texas Foundries and H/R aimed at the destruction of Universal as a producer of Type "G" lifting plugs. From the outset, plaintiffs have contended that on the 29th of November, 1971, Texas Foundries and H/R consummated a secret telephonic agreement whereby Texas Foundries committed itself to supply unfinished plugs to H/R at 31 cents per casting, at H/R's plant, after only eleven days earlier having assured Universal that a 32.5 cent per casting price, f.o.b. Texas Foundries plant, was the lowest price it could possibly offer. The reason for this discrepancy in price quotations is found, according to plaintiffs in H/R's precarious financial situation in November of 1971. Until 1970, the year of Universal's entry into the lifting plug market, H/R had been the leading producer of military lifting plugs. In 1970, however, Universal received the only government contract let that year, causing H/R a concomitant 60,000 dollar loss. At this point, plaintiffs' theory continues, realizing that failure to obtain the 1971 contract would necessitate abandonment of its plug business and fully aware that Universal's failure to get at least a portion of the 1971 contract would portend the latter's business demise,[7] H/R resolved to take whatever steps were necessary (including participation in a discriminatory pricing scheme) to insure that it would not again be underbid by Universal.[8]

 If plaintiffs' theory of the case and version of the evidence were accepted by the jury, as they may have been, then a Sherman Act violation has been established. We assume arguendo that the jury verdict was based on this premise, and that it was supported by the evidence. Under Section 1, 15 U.S.C. § 1, "Every contract, combination . . . or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." However proof of the existence of an actionable conspiracy is not enough. In addition to proof that the antitrust laws were violated, a plaintiff must also establish that such violation proximately caused injury to his business and adduce evidence that at least gives an indication of the amount of damage

award survey is then considered eligible for an award. The award must be made to that responsible bidder who submitted the lowest responsible bid, "unless there is a compelling reason to reject all bids and cancel the invitation." 32 C.F.R. § 2.404–1.

6. Land-Air was not surveyed because of an original determination that its bid was not responsive. After amendment, however, Land-Air's bid was reinstated and evaluated. See Text, infra at 1064.

7. In fact, after losing the 1971 contract to H/R, Universal was unable to acquire other work in the commercial field sufficient to hold its shop intact, and finally had to liquidate its equipment.

8. Other evidence supportive of plaintiffs' conspiracy theory included: proof that H/R would not consider itself able to bid unless it had positive commitments for all the plug castings it would need; H/R's knowledge prior to submission of its bid that its registered supplier, Marion Malleables, could not produce the rough castings in sufficient quantity to satisfy government requirements; H/R's assertion that still another supplier, F.M.C. Corporation, would supply the additional plugs necessary to meet the government's requirements, while during trial H/R's President admitted that no firm commitment was received from F.M.C. until after the contract was awarded; H/R's failure to notify the government of its "change" in suppliers until specifically asked to do so despite the requirements of pre-award disclosure and contract-in-process certifications; and Texas Foundries' realization that it would have a substantial overrun on its contract with Universal unless it found an alternate market for this material.

which resulted. Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 20 (5th Cir.), *rehearing en banc denied*, 496 F.2d 878, *cert. dismissed*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974); Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690 (5th Cir. 1975).

█ Under the facts of this case, plaintiffs failed the second of this three-pronged test, *i. e.*, they failed to prove that an injury to Universal resulted from defendants' discriminatory pricing scheme. While the fact of injury most often involves evidentiary questions which are properly for the jury [*e. g.*, Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544, 548 (1931)] no such jury issue exists where, as here, plaintiffs failed to establish that in the absence of defendants' discriminatory pricing scheme Universal would have received this contract. Thus, the trial court erred in refusing to direct a verdict for defendants on the Sherman Act claim at the close of plaintiffs' case.

Plaintiffs' premise is that, absent the illegal bid to H/R, Universal would have received the contract. However, the facts as adduced at trial reveal that even if H/R's bid is disregarded, Universal would not be the low bidder. Rather, Land-Air, Inc., a party wholly unconnected with either defendant, stands second behind H/R. Thus, without H/R's bid, Universal still would not have received the contract. To show that the asserted conspiracy did in fact injure them, plaintiffs contend that Land-Air was not a viable intermediary. They point out that its bid was classified by the APSA as unresponsive and therefore its position should not be considered. While it is true that Land-Air's bid was initially classified as non-responsive and consequently Land-Air did not receive a pre-award survey, a memo from the APSA contract specialist in charge of contract DAAA–09–72–C–0208 negotiations introduced at trial reveals that an amendment was received from Land-Air on December 1, which negated the previous non-responsive action considered, and

led to reinstatement of Land-Air's bid prior to award. It is crystal clear that Land-Air was a viable bidder and that, even after disregarding H/R's low bid because of the special, conspiratorially low price it received from Texas Foundries, Land-Air's bid stood between Universal and the opportunity to acquire this contract.

Plaintiffs attempted to circumvent the intervening position of Land-Air, Inc. through a hypothetical recalculation of the bid submitted by Universal. This recalculation was based upon the assumption that Universal should be entitled to utilize a price per casting equivalent to the 31-cent f.o.b. South Bend price which the conspiracy fetched for H/R. By utilizing this price and applying the same profit and other cost factors it had employed in submitting its bid based upon the 32.5-cent price, Universal calculated it would have bid an amount below those entered by both H/R and Land-Air, Inc., thus showing the conspiracy did cost it the contract award. The fallacy in this theory, however, is Universal's utilization of the 31-cent delivered price given to H/R.

█ The avowed purpose of the Sherman Act is the preservation of the open, competitive market. See, *e. g.*, Northern Pac. Ry. v. United States, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958); Apex Hosiery Co. v. Leader, 310 U.S. 469, 492–93, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940). Damages are recoverable thereunder if a plaintiff can show that the anticompetitive practice which inhibits that protected freedom of competition has proximately caused the damages he asserts. 15 U.S.C. § 15. For the case at bar, this rule means that damages are recoverable only upon a showing that absent the anticompetitive practice plaintiff would not have suffered the loss. The anticompetitive conduct which the evidence tended to establish in the case at bar was Texas Foundries' special 31-cent price to H/R, not its refusal to offer a comparable price to H/R's competitors. The price of 32.5 cents f.o.b. Texas Foundries plant was

shown to be the standard or usual market price quoted in connection with this bidding. It was the price initially quoted to H/R. It was the only price quoted to Universal and it was also the price quoted to an uninvolved third party, Deco Grand, Inc. Evidence of Texas Foundries' other dealings during this period further confirms that the 31-cent price was the conspiratorial price.[9]

Restoration of the competitive freedom which the Sherman Act is designed to protect through elimination of the anticompetitive practice is accomplished here by disregarding the special conspiratorial price to H/R, not by hypothetical broadening of the conspiracy to give H/R's abnormally low price to Universal as well. The problem for Universal is that it is not enough to merely restore the open competitive market status by knocking out the conspiracy, for then Land-Air, not Universal, would have become the lowest bidder. But more cannot be done. The result is that the conspiracy did not cause the damages upon which recovery was based, and, therefore, the verdict cannot be sustained under the Sherman Act.

### ROBINSON-PATMAN ACT CLAIM

Plaintiffs also assert that defendants' buy-sell agreement at 31 cents per cast-ing was violative of Section 2(a & f) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a & f). Under Section 2(a), it is unlawful for any person engaged in commerce to discriminate in price (1) between different purchasers (2) of commodities of like grade and quality (3) where the effect of such discrimination is to substantially lessen competition or tend to create a monopoly, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination and (4) where such differential is not in response to changing market conditions;[10] while under Section 2(f), it is unlawful to knowingly induce or receive discrimination in price prohibited by this section.

Recognizing that in order for there to be discrimination between purchasers violative of § 2(a) "there must be actual sales at two different prices to two different actual buyers," [11] plaintiffs pursue the Robinson-Patman claim on the basis of the price discrepancy between Universal's purchase-order contract with Texas Foundries dated November 12, 1971 and H/R's clandestine November 29th agreement with Texas Foundries which related to the December 30, 1971 contract.[12] These separate contracts contemplated contemporaneous

---

**9.** Texas Foundries charged Universal the 32.5-cent price in their November, 1971 purchase-order contract for 740,000 plugs to complete Universal's 1970 contract addition. In neither of their previous purchase-order contracts did Texas Foundries' price drop below 32 cents per unfinished plug casting. While the issue of which party was to pay the freight is in dispute under two of these contracts, under no circumstance would the ultimate cost to Universal per unfinished plug casting ever fall below the 31 cents f.o.b. South Bend price granted H/R.

**10.** In addition to the defense of changing market conditions, a defendant may rebut a prima-facie case of discrimination by showing that his lower price was made "in good faith to meet an equally low price of a competitor." 15 U.S.C. § 13(b). Since, as discussed *infra*, plaintiffs have failed to prove a prima-facie case we do not decide the applicability *vel non* of these defenses under the facts of this case.

**11.** Jones v. Metzger Dairies, Inc., 334 F.2d 919, 924 (5th Cir. 1964), *cert. denied*, 379 U.S. 965, 85 S.Ct. 659, 13 L.Ed.2d 559 (1965); *accord*, Stough v. May and Co., Inc., 484 F.2d 22, 23 (5th Cir. 1973); Hiram Walker, Inc. v. A & S Tropical, Inc., 407 F.2d 4, 7 (5th Cir.), *cert. denied*, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969). The term "purchaser" means a buyer or vender, not one who merely seeks to purchase. *E. g.*, Chicago Seating Co. v. S. Karpen & Bros., 177 F.2d 863 (7th Cir. 1949); Shaw's Inc. v. Wilson-Jones Co., 105 F.2d 331, 333 (3rd Cir. 1939).

**12.** Universal contracted with Texas Foundries on November 12 for the purchase of 740,000 unfinished plug castings (with delivery to continue through February, 1972) to fulfill the government's addition to Universal's 1970 contract. H/R's agreement with Texas Foundries was of course in contemplation of H/R's attainment of the December, 1971 contract and required delivery beginning in January, 1972.

delivery of Type "G" lifting plugs during 1972 but H/R was given a price of 31 cents delivered at its plant while Universal was given the substantially higher price of 32.5 cents at Texas Foundries' plant.[13]

Alternatively, plaintiffs argued at trial that a Robinson-Patman violation had occurred even if the jury believed that no agreement was reached by Texas Foundries and H/R on the 29th of November, but rather was made later—after the contract was awarded—and as a result of the failure of H/R's expected supplier to produce. They contend that even a January, 1972 agreement would still be reasonably contemporaneous with the November, 1971 agreement between Texas Foundries and Universal, since delivery was contemplated during the same periods under both contracts and no justification based upon a change in market conditions or good faith meeting of competition was shown.

Defendants contest the sufficiency of proof on every element essential to a Robinson-Patman Act violation. We need not weigh each element, however, as our conclusion that plaintiffs have failed to prove that the purchases were made "in competition" forestalls the necessity of further consideration of plaintiffs' claim under the Act.

■■■■ Discriminatory pricing is violative of Robinson-Patman only when it lessens or tends to prevent competition between customers or between sellers.[14] To constitute a Robinson-Patman wrong, the price discrimination must occur between competitors in comparable transactions—i. e., where persons receiving the different prices are in actual, functional competition with one another— and it must have the requisite effect upon actual or potential competition.[15] Even if the sales at different prices are contemporaneous, involve goods of like grade and quality, the price distinction is not justified by good business cause, and it causes injury to the disadvantaged' purchaser, recovery under the Act is precluded absent proof that the price variance detrimentally affected competition.[16]

■■■■ Competition between the buyers at disparate prices is essential to a violation of the Robinson-Patman Act, see Ag-Chem Equipment Co., Inc. v. Hahn, Inc., 480 F.2d 482, 490–91 (8th Cir. 1973), and the existence of this requisite is normally a fact question to be determined by making a realistic appraisal of all the relevant facts. F.T.C. v. Sun Oil Co., 371 U.S. 505, 527, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963). However, in the case at bar the relevant facts are without dispute. The government's selection under both the 1970 contract addition and the December, 1971 contract of a single producer for each precluded the possibility of competition between these

13. The Robinson-Patman legality of price discrimination between contracts to purchase that contemplate contemporaneous delivery, must be evaluated as of the dates the respective contracts were made. See, Texas Sulphur Co. v. J. R. Simplot Co., 418 F.2d 793, 806 (9th Cir. 1969).

14. 15 U.S.C. § 13(a). E. g., F.T.C. v. Sun Oil Co., 371 U.S. 505, 527, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963); Atlas Building Products Co. v. Diamond Block & Gravel Co., 269 F.2d 950, 954 (10th Cir. 1959), cert. denied, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960). Hartley & Parker, Inc. v. Florida Beverage Corp., 307 F.2d 916, 921 (5th Cir. 1962); Chicago Sugar Co. v. American Sugar Refining Co., 176 F.2d 1, 7 (7th Cir. 1949); Great Atlantic & Pacific Tea Co. v. F.T.C., 106 F.2d 667, 676 (3rd Cir. 1939), cert. denied, 308 U.S. 625, 60 S.Ct. 380, 84 L.Ed. 521 (1940); B. & W. Gas, Inc. v.

General Gas Corp., 247 F.Supp. 339, 343 (N.D. Ga.1965).

15. F.T.C. v. Borden Co., 383 U.S. 637, 643, 86 S.Ct. 1092, 1097, 16 L.Ed.2d 153 (1966). See Texas Gulf Sulphur Co. v. J. R. Simplot Co., 418 F.2d 793, 806 (9th Cir. 1969); Tri-Valley Packing Ass'n v. F.T.C., 329 F.2d 694 (9th Cir. 1964); Refrigeration Engineering Corp. v. Frick Co., 370 F.Supp. 702, 712–13 (W.D.Tex. 1974). "Essentially, we have in the particular situation an analogue to standing. The customer has standing only to raise and compare those sales which are injurious to his competition." Mayer Paving & Asphalt Co. v. General Dynamics Corp., 486 F.2d 763, 770 (7th Cir. 1973), cert. denied, 414 U.S. 1146, 94 S.Ct. 899, 39 L.Ed.2d 102 (1974).

16. See, e. g., Texas Gulf Sulphur Co., supra; S. S. Kresge Co. v. Champion Spark Plug Co., 3 F.2d 415, 420 (6th Cir. 1925).

suppliers as a matter of law. Universal's purchases proven here could only be accepted by the government in fulfillment of the 1970 contract addition, while H/R's purchases similarly could be used only on the 1971 contract. Regardless of a subsequent discrepancy in price to these suppliers, the government had to purchase *from each*, and only from each, the specified number of plugs at the agreed price under the respective contracts. This being established, the trial court erred in not granting defendants' motion for directed verdict on this aspect of plaintiffs' case.

It cannot be gainsaid that Universal and H/R were competitive *bidders* on the 1971 contract. They could not be, however, competitive purchasers as required by the Act either under their respective separate contracts or under both.[17] It is the government's unavailability to Universal as a customer of any of the government's needs under the December, 1971 contract, and its similar unavailability to H/R on the 1970 contract addition which prevents purchases made in performance on one from being in competition with those made under the other. Each contract represented a separate, distinct market open only to a single producer. Once it was awarded the bid, which was a prerequisite to becoming a purchaser from Texas Foundries, Universal's 1970 contract addition was assured to it to the exclusion of all other suppliers regardless of any discrepancy in prices paid on underlying subcontracts. In the same fashion, the government pledged itself unconditionally under the 1971 contract to purchase the specified quantity of finished plugs exclusively from H/R. The very nature of these mutually exclusive commitments in the respective contracts meant that Universal and H/R could not have been "in competition" with respect to their separate purchases from Texas Foundries pursuant to the government contracts. Therefore, while the price discrepancy between the two actual purchases (as distinguished from the bids related to the 1971 contract) could have affected Universal's profits under the addition to its 1970 contract, this discrimination in no way diminished Universal's competitive ability in that plug market. "Injury to a competitor is not the test; the test is injury to competition." Lloyd A. Fry Roofing Co. v. F.T.C., 371 F.2d 277, 281 (7th Cir. 1966). *Accord,* GAF Corp. v. Circle Floor Co., Inc., 463 F.2d 752 (2nd Cir. 1972), *cert. dismissed,* 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973).

"Antitrust legislation is concerned primarily with the health of the competi-

---

**17.** We emphasize it was the bids on the December, 1971 contract which were in competition—not the old and new sales assailed here. These bids alone cannot form the basis for a Robinson-Patman Act claim since they do not satisfy the two-purchaser requirement. A. J. Goodman & Son, Inc. v. United Lacquer Manuf. Corp., 81 F.Supp. 890, 892 (D.Mass.1949). *See* text at note 11, *supra.* We note this circuit's decision in American Can Co. v. Bruce's Juices, Inc., 187 F.2d 919, 924 (5th Cir.), *cert. dismissed,* 342 U.S. 875, 72 S.Ct. 165, 96 L.Ed. 657 (1951), which appears to create a special exception to the two-purchaser requirement where competitors in the same market are engaged in competitive purchasing and selling at the time of the price discrimination and where the failure of the plaintiff to consummate a second purchase of the item discriminatorily priced is directly attributable to defendant's own discriminatory practice. We conclude, however, that this exception is inapplicable on the facts now before us.

Specifically, in *Bruce's Juices,* the court held that plaintiff could bring a Robinson-Patman Act claim against defendant can manufacturer for defendant's refusal to offer plaintiff the same price on a particular type of can offered plaintiff's competitors, in spite of plaintiff's failure to purchase that particular type of can, where plaintiff was purchasing other types of cans not so discriminatorily priced and competing for the sale of its product packaged in such cans in the same market as its favored competitor. In our case, however, Universal and H/R never *purchased* in the same market. As mentioned previously, they were producing at all times pursuant to mandatory, single-producer contracts, *i. e.*, when they purchased unfinished plug castings it was always pursuant to a preexisting government commitment that could not be altered upon the government's ability to find a lower price after entry into the contract. For this reason, the *Bruce's Juices* exception is not applicable here.

tive process, not with the individual competitor who must sink or swim in competitive enterprise. But as a necessary incident thereto, it is concerned with predatory price cutting which has the effect of eliminating or crippling a competitor. For, surely there is no more effective means of lessening competition or creating monopolies than the debilitation of a competitor." Atlas Building Products Co. v. Diamond Block & Gravel Co., *supra,* 269 F.2d at 954. *Accord,* Borden Co. v. F.T.C., 381 F.2d 175, 178 (4th Cir. 1967). Universal cannot avail itself of this approach because it failed to show an injury to competition generally or that the revenue lost under the contract addition impaired its individual competitive status.[18]

Plaintiffs' Robinson-Patman claim is presented in a setting analogous to the situation where, although a seller sells his product at different discriminatory prices, he is not liable under Robinson-Patman because his buyers are not in competition for the same ultimate users.[19] In our case, although the government is the ultimate user under both contracts, those individual contracts constitute separate, distinct markets, each unaffected by prices available in the other. Universal and H/R were not competing for the same consumer dollar in their activities under the 1970 and the 1971 contracts.[20]

There being no theory which will support plaintiffs' Sherman or Robinson-Patman Act claims, the judgment below is

Reversed.

---

18. On the contrary, Universal must have felt that its profitability on all phases of the 1970 contract was satisfactory since it quoted its finished plug "addition" price to the government based upon a 32.5-cent casting price from Texas Foundries. Thus, though Universal could have realized an increased profit if it had received a lower casting price from Texas Foundries and not passed the savings on, even this hypothetical profit was not shown to have had the necessary deleterious competitive effect. While Universal did establish its business demise (See note 7), its proof of causation related to the deleterious effect of the failure to acquire the 1971 contract rather than the loss of profit on the 1970 contract addition.

19. *E. g.,* Ansul v. Uniroyal, Inc., 306 F.Supp. 541 (D.N.Y.1969), *aff'd,* 2 Cir., 448 F.2d 872, *cert. denied,* 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666; Davidson v. Kansas City Star Co., 202 F.Supp. 613, 618–19 (W.D.Mo.1962).

20. "The whole thrust of the Robinson-Patman Act concerns protection of competition for resale. . . . Competition is determined by careful analysis of each party's customers. Only if they are each *directly after the same* dollar are they competing." Ag-Chem Equipment Co., Inc. v. Hahn, Inc., 350 F.Supp. 1044, 1051 (D.Minn.1972), *modified on other grounds,* 480 F.2d 482 (8th Cir. 1973).