**SYMBOLIC CONTROL, INC.,**
**Plaintiff-Appellant,**

v.

**INTERNATIONAL BUSINESS MACHINES CORP.,**
**Defendant-Appellee.**

No. 76–2680.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 11, 1978.

Decided July 1, 1980.

As Amended on Denial of Rehearing and Rehearing En Banc Nov. 19, 1980.

As Amended Nov. 24, 1980.

■

John H. Boone, Boone, Schatzel, Hamrick & Knudsen, Frederick Furth, Furth, Fahrner & Wong, San Francisco, Cal., for plaintiff-appellant.

George A. Sears, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant-appellee.

■

Before BROWNING and KENNEDY, Circuit Judges, and DUMBAULD,* District Judge.

KENNEDY, Circuit Judge:

In this antitrust case Symbolic Control, Inc. (Symbolic) appeals from an order of the district court dismissing its suit against International Business Machines Corporation (IBM). After Symbolic had presented evidence limited to the single issue of causation, the suit was dismissed on the ground that upon the facts and the law the plaintiff had shown no right to relief. Fed.R. Civ.P. 41(b). In granting the motion, the district court found Symbolic had "failed to show 'with reasonable certainty and definitiveness' that overt acts or conduct of IBM were an 'actual' and 'substantial' cause of injury to plaintiff; " or "that defendant's conduct 'materially contributed' to plaintiff's injury." *Symbolic Control, Inc. v. International Business Machines Corp.*, [1976–1] TR.CAS. (CCH) ¶ 60,723 at 68,095 (N.D. Cal. Dec. 31, 1975) (citations omitted).

We think the causation analysis used by the district court, as a result of its bifurcation decision, was erroneous, and we reverse on this ground. We do not reach various other issues raised by Symbolic on this appeal.

## I

Both IBM and Symbolic produce a type of computer software known as an automatically programmed tools [APT] processor. This software permits the use of a computer in the production of metal parts in aviation, automobile manufacturing, and similar manufacturing enterprises. When an engineering diagram of a part to be produced is completed manually, the diagram is given to a computer programmer who translates the diagram into computer language, producing the "part program." At this point the APT processor comes into play: the APT processor, itself a computer program, is used by a computer to calculate the location, speed, and movement the machine tool must use to cut the metal part required.

The first APT processor was developed by the Massachusetts Institute of Technology under contract to the United States Air Force. A later version of this program, called APT III, was placed in the public domain. APT III was the basis of later refined versions of the APT processor developed by IBM, General Electric Corporation, Sperry Rand Corporation, and Control Data Corporation, for use with the various computers produced by each of these firms.

Between 1967 and 1970 IBM developed and distributed four versions of its APT processor, all designed for use with its System/360 computer. These software programs were identified as NC 360, followed by a version number and a modification level. IBM furnished all versions of the NC 360 program free of charge, and provided free maintenance and modification levels. Maintenance consists of correcting errors in the program, and a modification level is a compilation and incorporation of error corrections made after the release of the prior modification level.

Symbolic was incorporated in March, 1969, for the purpose of selling an APT processor to be known as APT/70. APT/70

---

* Honorable Edward Dumbauld, Senior United States District Judge for the Western District of Pennsylvania, sitting by designation.

was originally intended to be an improvement over the separate processors distributed by other hardware manufacturers, particularly IBM. However, in January, 1971, Symbolic released a processor designed to be used only with IBM's System/360 computers. Between January and November of the same year, when this suit began, Symbolic had not sold or leased its APT/70 to a single customer.

Symbolic sued IBM, alleging violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976), and sections 3 and 4 of the Clayton Act, 15 U.S.C. §§ 14, 15 (1976), as well as state claims. The theory of Symbolic's case was that because of the importance of software in general and APT processors in particular to the sale of large computers, IBM had a policy of giving the computer program, documentation and instructions to use the program, and maintenance of the program free of charge to computer users. Symbolic charged that this practice was illegal predatory pricing for the purpose of monopolizing the software market.

The district court denied IBM's motion for summary judgment and ordered a bifurcated trial. The first phase of the trial, by the court's order, was to be directed solely to "the issue as to whether plaintiff's business sustained legally cognizable impact by reason of act[s] of IBM." The court made it clear it was to be assumed, solely for purposes of trial in the first phase, that there was a violation of the antitrust laws.

At the close of Symbolic's evidence, the district court dismissed the suit against IBM, holding that the controlling evidence concerning impact of the alleged violation was testimony by users of IBM's NC 360. These customers were the potential users of APT/70. The court held that evidence of possible consequences of IBM's pricing the program, rather than giving it away, was irrelevant, because such evidence would be speculative and that pricing would not have been possible after IBM placed its various versions of NC 360 in the public domain. Relying on this analysis, the court found there was no impact on Symbolic's business, since user testimony revealed that price was not, to them, a relevant factor in the decision to use one product or the other.[1]

Assuming a violation, without evidence on the issue, in order to confine initial inquiry to the question of causation may not always foreclose an adequate causation analysis, but if the definition of the assumed violation remains amorphous, the causation inquiry can become both abstract and incomplete. That is what occurred here.

The theory of Symbolic's case was that IBM had foreclosed competition in a product line. The court assumed a violation had occurred but found that it did not cause the losses sustained by Symbolic. Yet if the assumed violation consists of IBM's giving away a discrete product line in order to bar a potential entrant from competing with the line, it is difficult to assume anything but adverse competitive effects. Closely related is the question of price. Symbolic attempted to establish that it could compete with IBM if IBM priced at cost. Symbolic therefore sought to establish at what price customers would consider rejecting IBM's program in favor of Symbolic's competitive product. Symbolic's price inquiry was foreclosed by the court, apparently on the tautological theory that only the real market conditions controlled and that no actual sales could have been made by Symbolic in

1. This was despite recurring testimony that price or cost factors were considered by potential purchasers of APT/70. *See* Appendix to Opinion, [1967–1] TR.CAS. at 68,099–102 (evidence pertaining to Boeing, General Motors, Westinghouse, Grumman, Teledyne Ryan, Texas Instruments). If there had been consistent, uniform, and unequivocal responses from potential users that "[e]ven if APT/70 had cost nothing," *see id.* (Westinghouse), and had been maintained for free, potential buyers would not have bought APT/70, we would be presented with a much different record, and one that might have supported an affirmance of the unusual bifurcation of issues in this case.

a market where the competing product was given away free.

The court's ruling was based, moreover, on the apparent premise of a demand for IBM's product that was impervious to price considerations. It assumes the very question in issue to argue that a product has been accepted over a competing product because of superior quality if the analysis is made wholly without reference to price. While there may be exceptions to this general principle, none was shown in this case.

The trial court made some findings that are inconsistent with its own premise of an assumed violation. For instance, the trial court seemed tacitly to decide the question of legality when it found that "IBM neither could nor would impose a charge on programs already distributed without restriction and in the public domain." [1976–1] TR.CAS. (CCH) at 68,098 (footnote omitted). To the extent that this statement means that IBM was legally prevented from charging for continued distribution and maintenance of Version 4 of NC 360, it implicitly but unavoidably is a finding that failing to price these improved versions was not predatory. This is contrary to the assumed violation required by the order confining the initial trial to the question of impact.

■ The bifurcation procedure in this case was therefore defective in two respects. First, the initial premise of a violation lacked specific content and definition; and second, the trial court ruled inconsistently with the premise in any event. Bifurcation of issues is an important device for trial efficiency, and we do not mean to foreclose its use, but the procedure which is adopted must not bar effective review or produce findings that are illogical or circular. Because those defects existed here, the bifurcation procedure became unwieldy. We cannot assess the accuracy of the court's impact findings in this case without evidence of the price structure that would have prevailed absent the violation. It is difficult, moreover, to analyze price structure without reference to a specifically defined violation, resting in turn on a clear definition of product line and market. Our inquiry here is akin to the search for a particular footprint among many, conducted with only a vague notion of the shoe that made it.

■ The crux of the trial court's holding is that factors other than IBM's alleged violation were the cause of injury to Symbolic: "Yet all the user testimony basic to the fact of injury (impact) establishes that the customers' reasons for not leasing APT/70 had nothing to do with overt acts of IBM." [1976–1] (CCH) TR.CAS. at 68,-099.[2] The district court seems to have relied on the finding that the quality of IBM's product was the sole cause of Symbolic's loss. Where two products are assumed to be relatively similar and thus affected by a demand curve that is elastic within at least part of its range, we cannot agree without more evidence than was presented here that quality was the sole factor in the buyer's decision. We hold that, on this record, IBM has not demonstrated that Symbolic's losses were unrelated to conduct of IBM that was, for purposes of the first phase of trial, assumed to be an antitrust violation.

We do not suggest, on the other hand, that Symbolic has made the requisite showing of impact. After further proceedings, it may be established that Symbolic's losses resulted from factors other than the wrongful conduct by IBM.

Reported decisions provide examples of business losses resulting from factors other than actionable conduct of the defendant. One cause that is held to intervene between a defendant's violation and plaintiff's injury is the latter's own self-destructive incompetence. Thus, in *Hanson v. Shell Oil Co.,* 541 F.2d 1352 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977), this court held that a former service

2. *But see* note 1, supra.

station operator could not recover from its gasoline supplier for horizontal and vertical restraints and predatory pricing because his own conduct damaged his business so greatly as to overwhelm any impact of the federal law violations.

Long before Shell's new pricing policy, Hanson was pumping quantities of gasoline far below those necessary to survive. His stations were old and dilapidated. He imposed two middlemen between the supplier and dealer, thus having trouble keeping his dealers because the margin that he could offer was too small. He had inadequate supplies of gasoline in a town flooded with it because he had gotten over his [h]ead in debts and lost all of his credit. In short, almost every piece of evidence points to the conclusion that Hanson went broke because of his incompetent and inefficient management.

*Hanson, supra,* 541 F.2d at 1360. *See also M. C. Manufacturing Co. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1064 (5th Cir. 1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976) (plaintiff failed to prove impact because third company made bid at a price between plaintiff's and defendant's).

The principle that factors other than price may preclude a showing of impact through violation must be read in light of cases such as these. *Cf. H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239, 247 (5th Cir. 1978) (impact showing may be "subject to the peril that the proof may show an independent reason why the plaintiff's bid would not have been accepted"). It may well be that the diverse factors enumerated in IBM's brief, such as deficient marketing, managerial weakness, and a misreading of the APT opportunity, were the real causes of Symbolic's problems.[3] IBM is in no position to make these

arguments in this court, however, because as a direct result of its rule 41(b) motion to dismiss we have no findings of fact as to these issues in the record before us.

## II

One minor issue may now be clarified in order that it not cause further difficulty on remand. Both the plaintiff and the defendant, as well as the trial court, spent much time and effort grappling with the concepts of "ante-natal violation" and "assumption of risk"; these concepts were thought to derive from the early Sherman Act case of *Buckeye Powder Co. v. E. I. Du Pont de Nemours Powder Co.,* 248 U.S. 55, 63–64, 39 S.Ct. 38, 39–40, 63 L.Ed. 123 (1918). The discussion of these concepts by both counsel is obscure, but in any event that case has no connection with Symbolic's suit against IBM. The plaintiff in *Buckeye* did not need to rely on any "ante-natal violations" because, as the trial judge instructed the jury,

> [a]t the time of the organization of the plaintiff company, . . . and during the entire time the plaintiff carried on its business, [the defendant] was acting in violation of the Antitrust Act as attempting to monopolize the trade in powder, which subjected it to be dissolved as such by direct attack on the part of the United States government.

*Buckeye Powder Co. v. E. I. Du Pont de Nemours Powder Co.,* 223 F. 881, 887 (3d Cir. 1915), *aff'd,* 248 U.S. 55, 39 S.Ct. 38, 63 L.Ed. 123 (1918) (quoting from unpublished trial court opinion). Justice Holmes' "ante-natal" dictum is a characteristic aphorism but has no bearing on his sound analysis, which did no more than state the obvious proposition that monopoly power gives no private right of action unless used oppres-

---

**3.** In addition, the definition of market and violation may clarify the issues in dispute. For example, the trial court might, in the course of a market definition inquiry, find that IBM and Symbolic were essentially providing services, and two different services at that: perhaps IBM's service was increasing the reliability of

APT processing, and Symbolic was providing the service of increasing the speed of APT processing. *Cf. United States v. E. I. Du Pont de Nemours & Co.,* 351 U.S. 377, 393–404, 76 S.Ct. 994, 1006–1012, 100 L.Ed. 1264 (1956) (discussing market definition and substitutability).

sively against a plaintiff to its detriment. The ante-natal violation issue has even less bearing on the case before us.[4]

It is not clear what significance the trial court's comments have that "plaintiff knew," before entering business, about this or that aspect of IBM's marketing. *See Symbolic Control, Inc., supra,* [1976–1] (CCH) TR.CAS. at 68,098. Symbolic's knowledge of IBM's alleged misdeeds is irrelevant. The only significance this awareness had in the *Buckeye* case was that if there had been evidence that Buckeye Powder Company was brought into existence only to acquire a cause of action against Du Pont, or alternatively to sell out to Du Pont at an inflated value, such evidence might have had some bearing on a jury's determination of whether the plaintiff had been adequately capitalized, which in turn would bear upon whether injury to it was due to the conduct of defendant or rather to other unrelated causes such as mismanagement. *Buckeye, supra,* 223 F. at 889 (quoting from unpublished trial court opinion). Even if Symbolic were brought into existence in circumstances where it was probable that it would be entitled to sue by reason of competitive injury, this alone has nothing to do with its right to recover as long as the three-fold requirements of violation, impact, and measure of damages are met. *Id.*

The judgment dismissing the suit is REVERSED and the case REMANDED for further proceedings not inconsistent with this opinion.

---

4. We cannot therefore accept the trial court's interpretation of *Buckeye,* that "an act prohibited by statute which injured plaintiff's business or property [must be] committed during the period of plaintiff's business" as a prerequisite to recovery. This statement is not supported by *Buckeye* in any way, and is far too sweeping in any event. An obvious counter-example might be a patent that is fraudulently procured by defendant before plaintiff's corporate existence, but in effect during its existence.