INDUSTRIAL BURNER SYSTEMS,
INC., A Michigan Corporation,
Plaintiff,

v.

MAXON CORPORATION, An Indiana
Corporation, Defendant.

No. CIV. 02–73127.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 4, 2003.

Kelly A. Kruse, Norbert B. Leonard, Bloomfield Hills, for plaintiff.

Fredric A. Smith, Michael J. Brady, Andrew B. Dzeguze, Southfield, Barnes & Thornburg, Indianapolis, IN, for defendant.

### MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

#### I.

Maxon Corporation ("Maxon") designs and manufactures a range of products for use in combustion and gas regulation systems. These include burner assemblies ("burners"), a wide variety of valves[1] (safety shut off. micro-ratio and control), and pipe or gas trains (sequences of pipe, valves, regulators, meters and other equipment through which natural gas is supplied—from a gas line to a burner, burner assembly or other industrial application). Their products are offered to various customers, including firms in the automotive industry.

---

1. These valves can be configured in a number of ways, including the use of different kinds of switches, finishes or other options.

Industrial Burner Systems ("IBS") supplies, designs and services parts and equipment for use in combustion and gas regulation systems. At least one company, Eclipse Products ("Esclipse"), which IBS serves as a manufacturer's representative for, designs and manufactures industrial burners.[2] Approximately 70% of IBS' business is derived from the sale of gas trains, with the residual coming from the sale of parts for gas trains. 85% of its gas trains are sold for use in automotive industry applications.[3] IBS purchases Maxon parts to be used as components in its gas trains.

Since 1974, Maxon has had a policy of offering various prices to customers "based on the nature of their operations." *See* Maxon's Motion for Summary Judgment, at 2. There is one price for burners and another for valves and gas trains (these prices are usually expressed by a pair of numbers—the first for burners, the second for valves). The price at which each product is offered is based upon a classification assigned by Maxon to the purchaser. The immediately relevant classifications for burners are: List, Resaler and Original Equipment Manufacturer ("OEM"). There are two relevant classifications for valves: Wholesaler and OEM. Any purchaser of valves or burners qualifying for OEM status, "based on the nature of their business," [4] is given the benefit of a substantial price reduction. IBS alleges that all of its competitors in the automotive industry gas train market have been given OEM status, while it has been specifically denied the OEM classification.[5] The record indicates that IBS was classified as a Resaler (for burners) and a Wholesaler (for valves). Therefore, whenever IBS purchased burners or valves from Maxon it paid more than it would have had it been listed as an OEM. Maxon also provides discounts for parties who agree to blanket purchase orders at set volumes at the start of a year ("BOD").[6]

**2.** IBS is a "manufacturer's rep[resentative] (i.e., sells burners) for Eclipse Products (which manufactures burners among other products)." According to Richard Clasby, Maxon Vice–President for Sales, Eclipse's manufacture (and therefore IBS' sale) of burners is in "direct competition" with Maxon. Moreover, in answer to the question "(is there anybody else) you recognize as direct competitors (in the Detroit burner market)," Clasby replied "[n]ot really ... (and if there is) we don't face them head to head in competition like we face IBS head to head, day in and day out." *See* IBS' Brief in Opposition to Defendant's Motion for Summary Judgment.

**3.** From 1992 until 2002, IBS' total sales have remained between $4 and $5 million. During this same time, various companies have both started and stopped making gas trains (for example, DLB, which has given up production in favor of purchasing gas trains from IBS).

**4.** What "based on the nature of their business" means is unclear. However, IBS alleges that, in his Deposition, Clasby "admitted that, when deciding which classification to assign to a customer, it considers whether that customer is a competitor of Maxon and that competitors are assigned higher prices. This is true even when the company is similarly situated and buying commodities of like grade and quality."*See* IBS' Brief in Opposition to Defendant's Motion for Summary Judgment, at 3. IBS further alleges that, through Clasby, Maxon has "admitted that it is trying to increase its market share—i.e., to reduce competition." *See Id.* at 3–4. Finally, IBS alleges, that Maxon, again through Clasby, has "admitted that one of the reasons it has refused to classify IBS as an OEM was because IBS was a competitor of Maxon." *See Id.*

**5.** Thus, even though these companies may not differ from IBS in "the nature of their business," they receive better prices from Maxon. IBS alleges that as a result the Competitors have a competitive advantage.

**6.** A firm is eligible for a BOD if the given purchase exceeds $100,000 and/or the firm agrees to buy "x" ahead of time. IBS alleges that, even when it has met the BOD threshold, Maxon has never offered it a BOD.

Additionally, individual orders of sufficient size are eligible for volume discounts.

The specific market structure at issue has three relevant levels. First, the component parts manufacturing level (primary-line), where Maxon and Eclipse design and manufacture, and Maxon sells, burners and valves.[7] Second, the gas train manufacturing level (secondary-line), where IBS, Maxon and the other gas train manufacturers ("Competitors") assemble parts from the primary-line into gas trains that are then offered to customers.[8] Finally, the customer level (tertiary-line), where companies, such as tier-1 auto suppliers, purchase the finished gas trains.

Transactions reaching the tertiary-line follow a specific process. First, the tertiary-line customer solicits bids for gas trains from the secondary-line companies. Second, secondary-line companies get quotes on valves and burners from the primary-line *before* calculating their bids. Third, with primary-line quotes in hand, the secondary-line companies then submit their competitive bids to the tertiary-line. Thus, even though a purchase may appear prospective in nature, it is for the purpose of the market for the bid, actual in fact.[9] Fourth, the tertiary-line customer then chooses the lowest bid (the amount of

which is inclusive of the already-determined price for the primary-line parts).[10] Finally, once the bid is secured, the secondary-line company retrieves the parts from the primary-line at the pre-established price.

In July 2002, IBS brought the present suit. The claim is an allegation of price discrimination under the Robinson–Patman Act, 15 U.S.C. § 13(a), seeking treble damages. Subsequent to the filing of this suit, Maxon completely terminated its relationship with IBS. IBS sought a preliminary injunction to compel Maxon to continue honoring purchase orders submitted to Maxon, but was denied. Ross Flora, the President of IBS, indicated that IBS had been able to obtain an alternative source for Maxon products, but at a higher price than those previously paid by IBS to Maxon.[11] IBS is pursuing a claim for "lost profits," based on the theory that IBS had lost various jobs for gas trains over the years because of bid prices.

Maxon has now moved for summary judgment under Fed.R.Civ.P. 56(c).

## II.

Although both the Supreme Court and this circuit have emphasized that Rule 56 makes absolutely no distinction between

---

**7.** The primary-line may arguably include IBS in its capacity as a manufacturer's representative. However, in its response to Maxon's motion for summary judgment. IBS argues that this lawsuit is only presenting a "secondary-line" Robinson–Patman claim.

**8.** It is also possible that Maxon, as a primary-line manufacturer of valves, burners and other relevant parts, deals directly with tertiary-level customers (for the purpose of the gas train market) as secondary-line competitors (for their respective industrial applications). However, for the purposes of this instant motion Maxon's relationship to those parties is described as falling within the tertiary-line.

**9.** The relevant competition in this market is for the bid; and, at this point, the bids are reflective of purchase prices. Moreover, it is

undisputed that the amount of the quotes given by Maxon to the secondary-line competitors are not dependent on securing the contract from the tertiary-line customer.

**10.** All other things being equal, it is at least reasonable to determine that higher prices for given parts result in higher bid amounts and a lower likelihood of successfully producing a winning bid.

**11.** As part of the discovery process, IBS produced bids or quotes from IBS that were pending or submitted after Maxon terminated its relationship with IBS. In making these disclosures, IBS also identified the categories and amount of its alleged damages.

antitrust and other cases, *see First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Daily Press, Inc. v. United Press International*, 412 F.2d 126, 128 (6th Cir.), *cert. denied*, 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969), both of these courts have repeatedly indicated that summary judgment should be used sparingly in complex antitrust litigation. *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1324 (6th Cir.1983); *Smith v. Northern Michigan Hospitals, Inc.*, 703 F.2d 942, 947 (6th Cir.1983).

### III.

Section 2(a) of the Robinson–Patman Act provides, in pertinent part, as follows:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality...where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).

Price discrimination claims generally fall into three categories. *See George Haug Co. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 141, n. 2 (2d Cir.1998); *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, n. 1 (2d Cir.1987). The first, primary-line price discrimination, occurs when a seller's price discrimination harms competition with the seller's competitors. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). The next, secondary-line price discrimination, occurs when a seller's discrimination impacts competition among the seller's customers; i.e. the favored purchasers and disfavored purchasers. *See, e.g., Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 558 n. 15, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990); *F.T.C. v. Sun Oil Co.*, 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963). The third, tertiary-line violation, occurs when the seller's price discrimination harms competition between customers of the favored and disfavored purchasers, even though the favored and disfavored purchasers do not compete directly against another. *See, e.g., Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 436, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983). Only the first two line-types may be at issue in the present case.[12]

■ To establish secondary-line price discrimination under section 2(a), a plaintiff has the burden of establishing four things: (1) that seller's sales were made in interstate commerce; (2) that the seller discriminated in price as between the two purchasers; (3) that the product or commodity sold to the competing purchasers was of the same grade and quality; and (4) that the price discrimination had a prohibited effect on competition. *See Haug*, 148 F.3d at 141; *Hasbrouck*, 496 U.S. at 556, 110 S.Ct. 2535. Finally, in the case of a private plaintiff who has proved a violation of section 2(a), that plaintiff must, in order to recover damages under § 4 of the Clayton Act, demonstrate a fifth element: that it suffered actual injury to its business or

---

**12.** In their Response to Maxon's Motion for Summary Judgment, IBS asserts that this is "a secondary-line" Robinson–Patman case. *See* Plaintiff's Brief in Opposition, at 6. Whether this is an exclusive description of the case at hand will be more fully explored below.

property as a result of the price discrimination. *Id.* at 141 (citing *J. Truett Payne, Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981)).[13]

Maxon has not argued that the sales in question were not made in interstate commerce, that the products sold to IBS and its competitors were not of "like grade and quality" or whether there was, in fact, a "price discrimination."[14] Instead, Maxon asserts that: (1) because there were never two "contemporaneous" purchases, there could never be discrimination within the meaning of the Robinson–Patman Act; and, (2) because of the market structure inherent in competitive bidding, there could, as a matter of law, be no "competitive injury." Next, Maxon avers that IBS is unable to prove antitrust injury, i.e., a present injury that is actually traceable to the benefits conferred upon the favored competitor. Finally, a statute of limitations defense is made.

### Comemporaneous

■ Section 2(a) of the Robinson–Patman Act "requires that each purchaser be given an 'equal opportunity' by the seller to receive the benefit of higher or lower prices." *Haug,* 148 F.3d at 140. Maxon argues that this "equal opportunity" requirement of Robinson–Patman cannot be satisfied absent a contemporaneous discrimination in price.

In *Innomed Labs, LLC v. Alza Corp.,* the defendant similarly argued that, because the distribution agreements for the competitor and the plaintiff were executed at different times, i.e., one in August 1997, and the other in December 1997, the plaintiff could not show that the price discrimination was "contemporaneous." as required under the Robinson–Patman Act. 211 F.R.D. 237 (S.D.N.Y.2002). However, in rejecting this argument, the court held that a plaintiff can show contemporaneous transactions by demonstrating that it was "engaged in actual competition with the favored purchaser(s) as of the time of the price differential." *Id.* (citing *Best Brands,* 842 F.2d at 584): *see also Chroma Lighting v. GTE Prods. Corp.,* 127 F.3d 1136 (9th Cir.1997) (unpublished).[15]

**13.** While section 2(a) affords defendants two defenses based on certain cost justifications and/or changing conditions, *see* 15 U.S.C. § 13(a), Maxon has not asserted either of them.

**14.** It is entirely possible that Maxon's assertion that the "two purchaser requirement" (or the so-called "contemporaneous" sales requirement) was not satisfied is an assault on the latter portion of the second element, or possibly the second element in its entirety. Likewise, this argument may go to the fourth element, by disputing that the price discrimination had a prohibited effect on competition. Or it may be an attempt to undermine both. Although it is possible to envision a situation where the direction of the defendant's thrust will make a difference in the analysis, under the facts of this case it is a distinction without a difference.

**15.** In *Chroma Lighting,* the defendant argued that the plaintiff could not have been in competition with either of its alleged competitors because it purchased its product from the defendant only after he had a customer's order in hand. 111 F.3d 653 (9th Cir.1997). According to the defendant's theory, if the plaintiff purchased a product from the defendant after he had already "sold" that product to a customer, then the plaintiff could not be in competition for the resale of that particular product. *Id.* Defendant also argued that if the plaintiff did not have a customer bid, then he would have no reason to purchase a product, and there could be no "contemporaneous" sale. *Id.* The court found the defendant's theory "unconvincing." *Id.* Whether or not the plaintiff actually purchased his inventory before or after he made customer sales does not change the fact that he competed for each sale on the basis of the price he expected to get from the defendant. This evidence was sufficient to satisfy the Robinson–Patman Act's requirement that discriminatory sales be "substantially contemporaneous."*Id.*

In the course of the same litigation, but upon a different motion, the court again clarified that Robinson–Patman merely "requires that the sales, which form the basis of the discrimination, must be reasonably proximate in time." *Innomed Labs, LLC v. Alza Corp.*, 211 F.R.D. 237 (S.D.N.Y. 2002) (citing 3 Earl W. Kintner & Joseph P. Bauer, Federal Antitrust Law).[16] Applying that standard to the facts of its case, the court found nothing, as a matter of law, to support the position that contracts formed a few months apart cannot be considered "contemporaneous" for purposes of analysis under the Robinson–Patman Act. *Id.* at 237. In the present case, it is undisputed that IBS was in competition with the other secondary-line companies throughout the relevant time, in the relevant market.[17]

Maxon cites *Shavrnoch v. Clark Oil and Refining Corp.*, 726 F.2d 291, 295 (6th Cir.1984), for support of its proposition that "Robinson–Patman is only violated when two distinct purchasers have made contemporaneous purchases of the goods in question at different prices." *See* Maxon's Motion for Summary Judgment, at 8. However, *Shavrnoch* does not mention the word contemporaneous. Rather, it simply holds that "the intra-corporate transfers of gasoline from [the defendant] to its company-operated stations are not sales within the meaning of the statute ... [and therefore, since] no second 'purchaser' exists, plaintiff's first price discrimination claim must also fail." *Shavrnoch*, 726 F.2d at 295–6. Therefore, to the extent that Maxon has attempted to read a contemporaneous requirement in to Robinson–Patman based on *Shavrnoch*, it must fail.[18] *But cf. A.A. Poultry Farms v. Rose Acre Farms*, 881 F.2d 1396, 1407 (7th Cir.1989), *cert. denied* 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990) ("No case of which we are aware holds, however, that fluctuations over time to the same customer are 'price discrimination' within the meaning of the Robinson–Patman Act.").

### Competitive Injury

■ Maxon's second argument is aimed at the requirement that the price discrimination had a prohibited effect on competition. To resolve this issue, it must first be determined what degree and type of market consequences will constitute the proscribed statutory effect upon competition within a case of secondary-line price discrimination?

The proper secondary-line competitive injury analysis is set forth in *Haug*, 148

---

**16.** *Innomed Labs, LLC v. Alza Corp.*, 211 F.R.D. 237 (S.D.N.Y. 2002)(Because, to accept the such an argument would require "truncat[ing] the balance of § 13(a), which states that it shall also be unlawful to 'injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination.' ")

**17.** Maxon does argue that IBS was not in competition at the time of what it characterizes as the "actual purchase" of its products by IBS, because the competition ended when the contract was awarded to the lowest bidder. However, as explained below, it is precisely because the relevant period of competition is prior to the award of the bid that the quote given by Maxon at that time carries the discriminatory price effect.

**18.** Moreover, even if this court had found that there was a contemporaneous requirement and applied it against IBS, other courts have held that "an established customer who is currently purchasing one type of goods at a higher price and is denied the right to buy a lower-priced good of 'like grade and quality' which is being sold to a competitor can sue under the Act." *See, e.g., Fusco v. Xerox Corp.*, 676 F.2d 332, 335 (8th Cir.1982) (citations omitted). Based on Maxon's refusal to grant IBS OEM status in the present case, IBS could have failed Maxon's self-styled "contemporaneous" requirement and still had the right to sue under the Act.

F.3d at 140. From the beginning, the court notes that "it is hornbook law ... that anti-competitive injury need not be alleged to sustain a claim for violation of the Robinson–Patman Act; a price differential, direct or indirect, between secondary-line competitors is enough. The Act requires that each purchaser be given an 'equal opportunity' by the seller to receive the benefit of higher or lower prices." *Id.*

However, "[as] a prerequisite to establishing competitive injury in a secondary line price discrimination case, a plaintiff must prove that 'it was engaged in actual competition with the favored purchaser(s) as of the time of the price differential.'" *Id.* at 141 (citing *Best Brands*, 842 F.2d at 584).

### Actual Competition

"Determining the presence or absence of functional competition between purchasers of a commodity is simply a factual process which focuses on whether these purchasers were directly competing for resales among the same group of customers." *Haug*, 148 F.3d at 141 (citing *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968)).

To satisfy the 'competitive nexus' requirement, " 'it must ... be shown that, as of the time the price differential was imposed, the favored and disfavored purchasers competed at the same functional level, i.e., all wholesalers or all retailers, and within the same geographic market.'" *Id.* at 141–42 (quoting *Best Brands Beverage,*

*Inc.*, 842 F.2d at 585); *Stelwagon Mfg. Co. v. Tarmac Roofing Sys.*, 63 F.3d 1267, 1271 (3rd Cir.1995). Here, the facts show that, at a bare minimum, there is a genuine issue of material fact as to whether IBS and its Competitors, despite being categorized differently, competed on the same functional level (as wholesalers and/or retailers) and in the same geographic market (Detroit).

 In an attempt to argue that there was no actual competition, Maxon asserts that:

> "If IBS buys a Maxon product, it is the only relevant sale Maxon makes—IBS has eliminated all competition, regardless of what Maxon quoted to any potential competitor, before IBS ever buys. Therefore, by the time IBS buys anything, no potential or actual harm to competition or IBS' ability to compete could be caused by the purchase itself."
> *See* Maxon's Motion for Summary Judgment, at 11.

Closely tracking the reasoning of its "contemporaneous" sales argument, Maxon avers that there cannot be a prohibited impact on competition from the sale to IBS because there are not two sales and effectively no competition. Maxon bases its approach to Robinson–Patman on language in *M.C. Manufacturing Co., Inc. v. Texas Foundries, Inc.*, 517 F.2d 1059 (5th Cir.1975). There, the court found that the particular contract/bid structure presented by the facts eliminated any possibility of an impact on competition from any price differences. *Id.* at 1066.[19] According to

---

19. The court reasoned that:

"[o]nce it was awarded the bid, which was a prerequisite to becoming a purchaser ... [the plaintiff's] 1970 contract was assured to it to the exclusion of all other suppliers regardless of any discrepancy in prices paid on underlying subcontracts. In the same fashion, the [tertiary-line customer] pledged itself unconditionally under the 1971 contract to purchase the specified quantity of finished plugs exclusively from [the compet-

itor]. The very nature of these mutually exclusive commitments in the respective contracts meant that [the plaintiff and the competitor] could not have been 'in competition' with respect to their separate purchases from [the defendant] pursuant to the government contracts. Therefore, while the price discrepancy between the two actual purchases (as distinguished from the bids related to the 1971 contract) could have affected [the plaintiff's] profits under the addition to its 1970 contract, this discrimi-

that court, "[e]ach contract represented a separate distinct market open only to a single producer." *Id.* at 1067. Therefore, while the bidding process itself was competitive, the court felt that there were not two, or in fact any, statutory purchases at the time of the bid. *Id.*

As an initial matter, this approach unnecessarily blends the "separate purchaser" requirement found in the second price discrimination factor, with the competitive injury requirement found in the fourth factor. More importantly, this interpretation overlooks the practical impact of the competition in the bidding process—the relevant competitive market—by focusing on the after-the-matter "purchase." In a bid-contract structure, this purchase is, for purposes of the competition for the bid, a second symbolic purchase.

Moreover, the fact-specific holding of *M.C. Manufacturing* is readily distinguishable from the present circumstances. First, the plaintiff's claim in that case was "analogous to the situation where ... [the] buyers are not in competition for the same ultimate users." 517 F.2d at 1067. There, the court stated that "although the government is the ultimate user under both contracts, those individual contracts constitute separate, distinct markets, each unaffected by prices available in the other ... [because the plaintiff and competitor] were not competing for the same consumer dollar in their activities under the 1970 and the 1971 contracts." *Id.* Here, IBS and its competitors were in competition for the same ultimate users—the tertiary-line industrial customer. Therefore, access to the same ultimate user is determined by the outcome of the competitive bid, and the

analogy used in *M.C. Manufacturing* is not applicable to the present facts.

Second, the court in *M.C. Manufacturing* took note of a special exception "to the two-purchaser requirement where competitors in the same market are engaged in competitive purchasing and selling at the time of the price discrimination and where the failure of the plaintiff to consummate a second purchase of the item discriminatorily priced is directly attributable to defendant's own discriminatory practice." 517 F.2d at 1066–67 n17 (citing *American Can Co. v. Bruce's Juices, Inc.,* 187 F.2d 919, 924 (5th Cir.), *cert. dismissed,* 342 U.S. 875, 72 S.Ct. 165, 96 L.Ed. 657 (1951)). In the instant case, there is at least a genuine issue of material fact concerning whether the failure of IBS to "purchase" subsequent Maxon products was related to a prior discriminatory practice of IBS. Importantly, there is also language to suggest that at the time *M.C. Manufacturing* was decided that court was applying a primary-line competitive injury analysis to a secondary-line fact pattern.[20]

Maxon rightly notes that the Sixth Circuit has not specifically addressed the fact pattern in *M.C. Manufacturing.* Additionally, Maxon asserts that the Sixth Circuit has stated that the relevant inquiry under Robinson–Patman is whether individual transactions, not an overall course of dealing, violate the statute. *See Cellar Door Productions, Inc. v. Kay,* 897 F.2d 1375, 1377–78 (6th Cir.1990). However, even if this pronouncement has been made, this does nothing more than beg the question of what constitutes the "individual transaction" under the instant facts. Maxon would characterize the after-the-matter

---

nation in no way diminished [his] competitive ability in that ... market." *Id.* at 1066–67.

**20.** *See M.C. Manufacturing,* 517 F.2d at 1068 ("[Antitrust legislation] is concerned with predatory price cutting which has the effect of

eliminating or crippling a competitor. For, surely there is no more effective means of lessening competition or creating monopolies than the debilitation of a competitor." (citation omitted)).

"purchase" of components for use in the individual gas train contract as the market and hope to believe that "all competition in that market has been eliminated before any Maxon products are purchased for inclusion in the finished gas trains that are sold in that market." Yet, the facts as presented demonstrate that the relevant competition is in the market for the bid. Accordingly, because genuine issues of material fact remain as to the whether price discrimination is the mechanism by which "competition in that market ...[has] been eliminated," the court is constrained to deny Maxon's motion for summary judgment as to the existence of a competitive relationship.

### Reasonable Probability That Competition Has Been Harmed

■ Once the existence of a competitive relationship has been established, the plaintiff must demonstrate a reasonable possibility that competition has been harmed as a result of the price differential. *See Haug,* 148 F.3d 136, 142 (citing *Falls City Industries,* 460 U.S. at 434–435, 103 S.Ct. 1282) (citing *Corn Products Refining Co. v. FTC,* 324 U.S. 726, 742, 65 S.Ct. 961, 89 L.Ed. 1320 (1945)).

In *FTC v. Morton Salt Co.,* 334 U.S. 37, 46–47, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), a secondary-line price discrimination case, the Supreme Court held that competitive injury may be inferred from evidence demonstrating injury to an individual competitor. *See Id.* at 142.[21] Specifically, the Court permitted "an inference of injury to competition from evidence of a substantial price difference over time, because such a price difference may harm the competitive opportunities of purchasers, and thus create a 'reasonable possibility' that competition itself may be harmed." *Morton Salt,* 334 U.S., at 46, 50–51, 68 S.Ct. 822; *Has-*

---

**21.** Both Maxon and IBS have failed to raise an important legal issue which has not been addressed by this Circuit; namely, in secondary-line cases, whether after *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), the same sort of anti-competitive injury which is a prerequisite under the Sherman Act must be shown under section 2(a) of the Robinson–Patman Act (which would in effect make the *Morton Salt* inference invalid). Four Circuits addressing this issue have determined that the *Morton Salt* inference is applicable in secondary-line price discrimination cases even after *Brooke Group. See George Haug Co. v. Rolls Royce Motor Cars, Inc.,* 148 F.3d 136, 144 (2d Cir.1998) (Expressly adopting the First Circuit's view expressed in *Coastal Fuels of Puerto Rico, Inc.,* that the *Morton Salt* inference is still applicable); *Chroma Lighting v. GTE Products Corp.,* 111 F.3d 653, 658 (9th Cir.), *cert. denied,* 522 U.S. 943, 118 S.Ct. 357, 139 L.Ed.2d 278 (1997) (expressly adopting the First Circuit's conclusion that the *Morton Salt* inference is applicable in secondary-line price discrimination cases even after *Brooke Group* ); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182 (1st Cir.1996) (concluding that *Morton Salt* remained good law despite the holding in *Brooke Group* ); *Stelwagon Mfg. Co. v. Tarmac Roofing,* 63 F.3d 1267, 1272 (3rd Cir.1995) (finding that a claim in a secondary-line price discrimination case under the Robinson–Patman Act is supportable upon proof of a substantial price discrimination between competitors over time); *see also Chawla v. Shell Oil Co.,* 75 F.Supp.2d 626, 652 (S.D.Tex.1999) (where the district court concluded that the Fifth Circuit would not extend *Brooke Group* to second-line cases); *Innomed Labs,* 211 F.R.D. 237 (S.D.N.Y.2002) (There is " a critical distinction between the prima facie elements of the Sherman Act (where there is a need to adequately allege, or point to facts to support an allegation, that the plaintiff sustained the requisite injury, i.e., that the challenged action has had an actual adverse effect on competition as a whole in the relevant market) and the Robinson–Patman Act (where a plaintiff need not similarly allege an injury on the market)..."). After examining the reasoning set forth in the above cases, this court, like the court in *Chawla,* concludes that the Sixth Circuit would not extend the reach of *Brooke Group* beyond primary-line cases.

*brouck,* 496 U.S. at 559, 110 S.Ct. 2535 (An adverse effect on competition may also be "inferred from evidence that some purchasers had to pay their supplier substantially more for their goods than their competitors had to pay."); *Haug,* 148 F.3d at 142; *see also Chroma Lighting,* 111 F.3d 653 (where the court rejected defendant's argument that the plaintiff failed to prove competitive injury, either through a showing that defendant maintained a substantial price difference over time, or through evidence that plaintiff lost sales or profits due to the defendant's discriminatory prices).

In the present case, the price at which each product is offered is based upon a classification assigned by Maxon to the purchaser. As stated above, any purchaser of valves or burners qualifying for OEM status, "based on the nature of their business," is given the benefit of a substantial price reduction. One way to demonstrate that a price discrimination is "substantial" is to demonstrate that it affects the resale price of the commodity. *See Morton Salt,* 334 U.S. at 47, 68 S.Ct. 822. However, it is not necessary for IBS to show that "the favored customer actually undersold his rivals." *Kroger Co. v. FTC,* 438 F.2d 1372 (6th Cir.1971) *cert. den'd* 404 U.S. 871, 92 S.Ct. 59, 30 L.Ed.2d 115 (1971).

The Maxon Corporation Price And Commission Table ("Table") demonstrates that a company listed as an OEM is offered the same item at a substantial discount from the prices offered to a Resaler, or Wholesaler, which are the classifications assigned to IBS. The discounts on valves and burners offered to the OEM classification range from 5.5 to 14%.[22] Other courts viewing discounts below even the lowest discounts present in the Table have found such amounts to be "substantial." *See, e.g., Foremost Dairies, Inc. v. FTC,* 348 F.2d 674, 679 (5th Cir.), *cert. denied,* 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362 (1965) (an approximate five percent advantage was sufficient, even though resale prices were not affected); *Allied Sales and Service Co. v. Global Industrial Technologies. Inc., et al.,* 2000 U.S. Dist. LEXIS 7774, 2000 WL 726216 (Ala.2000) (whether or not the parties' resale prices were affected, "any price reduction amounting to over five percent of the purchase price probably will be considered a significant or substantial discrimination." quoting 3 Von Kalinowski, Antitrust Laws and Trade Regulation § 39.02[3][d][i](2d ed.1996)). Accordingly, this court cannot say that the discounts evidenced in this case are, as a matter of law, insubstantial.

The second step in determining if there is a "reasonable probability that competition has been harmed" requires the court to ask whether the price discrimination has lasted "over time." In the present case, Mr. Flora alleges in his deposition that the OEM/non-OEM price classification was in place for a period of several years—possibly more than ten years.[23] A

---

**22.** The Table (which appears to be from January 1996) list the following price differentials: "End Products" are offered to the OEM at (.80), and to the Resaler at (.90)—a difference of 14%; "Parts and Subassemblies" are offered to the OEM at (.85), and to the Resaler at (.93)—a difference of 9.4%; "Regulators, Pipe Trains" are offered to the OEM at (.90), and to the Resaler at (.95)—a difference of 5.5%; "SOV–STO End Products" are offered to the OEM at (.66) and to the Wholesaler at (.73)—a difference of 10.6%; "SOV–STO Parts % Subs, Modular End Products" are offered to the OEM at (.80) and to the Wholesaler at (.90)—a difference of 14%; "Modular Parts and Subassemblies" are offered to the OEM at (.90), with no listed price for Wholesaler.

**23.** Moreover, even if this court had determined that deposition, standing alone, was insufficient to create a genuine issue of material fact as to the duration of the alleged discrimination, when combined with the differing prices in the Table, Flora's deposition creates a genuine issue of material fact con-

ten year period of price discrimination satisfies the duration deemed sufficient by other courts examining the issue. *See, e.g., Foremost Dairies v. FTC*, 348 F.2d at 679 (two years was sufficient); *Coastal Fuels, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 193 (1st Cir.), *cert. denied,* 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 214 (1996)(18 months was sufficient). Therefore, to the extent that Maxon's motion for summary judgment is based on the price discrimination not having lasted "over time," it is denied.

## IV.

### *Antitrust Injury*

Even if IBS is able to escape summary judgment on the first four factors discussed above, it must, if it is going to have standing to recover damages as a private plaintiff, demonstrate that it suffered actual injury to its business as a result of the price discrimination—the antitrust injury requirement. *See Schwartz v. Sun Co.*, 276 F.3d 900, 905 (6th Cir.2002) 276 F.3d 900, 904 (A private plaintiff's success on Robinson–Patman's second prong requires both a "competitive injury," either a potential injury to competition generally or a diminution of the business opportunities of a defined class of competitors, and an "antitrust injury," a present injury that is actually traceable to the benefits conferred upon the favored competitor.).

To establish antitrust injury, IBS has the burden of: (1) proving cognizable antitrust injury; and (2) providing at least a non-speculative approximation of its damages. *See J. Truett Payne Co., supra.*

### *Proving Cognizable Antitrust Injury*

 To establish cognizable antitrust injury, IBS must both demonstrate the existence of an injury and "that the challenged price discrimination is a *material* cause of that injury." *Allied Accessories and Auto Parts Co., Inc. v. General Motors Corp.*, 901 F.2d 1322, 1325–26 (6th Cir.1990) (emphasis in original) (*"Allied II "*). It is well-established that proving cognizable antitrust injury should not be unduly rigorous. *Id. Stelwagon, supra,* at 1273–74, summarized the applicable law:

> Because damage issues in these cases are rarely susceptible to the kind of concrete, detailed proof of injury which is available in other contexts, the Supreme Court has repeatedly held that in the absence of more precise proof, the factfinder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs." *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946) (citations omitted).

Maxon argues that, even if IBS' purchases could serve as the basis for a Robinson–Patman claim, the only evidence of antitrust injury that IBS has presented is the gross quantities of goods it has purchased from Maxon. Maxon further argues that IBS has not shown it ever lost a sale, profits or its value, based on the difference between what it and another customer paid Maxon—the injuries, according to it, that Robinson–Patman is designed to remedy.

Two situations are at issue in the present case: the first, is that which arises only on the occasion where there is an after-the-matter "purchase"; the second, is

cerning the duration of the alleged price discrimination. Therefore, even under this view, summary judgment would not be appropriate.

the always-present competition to secure the bid.

In the situations where IBS has alleged that it suffers price discrimination in the after-the-matter "purchase," it is inappropriate to grant summary judgment in Maxon's favor. The Sixth Circuit has previously acknowledged that "whenever there is price discrimination ... the overall financial health of the disfavored purchaser will usually be affected for the worse." *Schwartz v. Sun Co.*, 276 F.3d 900, 905 (6th Cir.2002) (citing *Kroger v. FTC*, 438 F.2d 1372, 1378 (6th Cir.1971) (quoting *National Dairy Products Corp. v. FTC*, 395 F.2d 517, 522 (7th Cir.1968)) ("It is unnecessary that there be evidence that the favored customer actually undersold his rivals; a substantial price advantage can afford a favored buyer a material capital advantage by enlarging his profit margin in a highly competitive field.")). In this scenario, it is evident from the Table that IBS has paid a higher price than it would have had it been classified as an OEM. This evidence, combined with Flora's testimony as to the role which Maxon's discriminatory pricing played in IBS' ability to compete, create, at a minimum, a genuine issue of material fact as to the issue of cognizable antitrust injury to IBS in the after-the-matter "purchase." Therefore, summary judgment must be denied on this issue.

In the instant case, however, the loss is not limited to the situation where IBS has made an after-the-matter "purchase" of the components. As described above, the relevant competition is for the bid. Moreover, losing out on a bid that is "always profitable," a fact that Maxon has asserted in an attempt to undermine IBS' attempt to establish cognizable antitrust injury, appears to cut the other way; loss of an "always profitable" bid is by definition a "lost profit."

After bids are solicited by the tertiary-line customer, IBS and its Competitors get quotes on valves and burners from the primary-line *before* calculating their bids. Next, with primary-line quotes in hand, the secondary-line companies then submit their competitive bids to the tertiary-line. This moment is the relevant point of competition, and it is at this time that the discriminatory price will have *an* adverse impact on IBS' ability to compete (potentially resulting in the loss of the contract for the gas trains because of a higher bid reasonably attributable to the higher costs for valves and/or burners that form a necessary component of the bid amount).[24] Thus, even though a purchase may appear prospective in nature, it is for the purpose of the market for the bid, actual in fact. *See Allied II*, 901 F.2d at 1325–26 (where a former buyer for the retailer indicated that a crucial factor in awarding the contract was the other bidder's lower price, the Sixth Circuit Court of Appeals held that the trial court's finding that an automobile parts manufacturer's price discrimination in favor of one bidder was a material cause of a retailer's decision to award its oil filter account to the other bidder was not clearly erroneous).

When the tertiary-line customer then chooses the lowest bid (the amount of which is inclusive of the already-determined price for the primary-line parts), and the secondary-line company then re-

---

**24.** The *Morton Salt* inference, as applied in *Allied II*, does not require the plaintiff to prove that price discrimination was the sole or "but for" cause of his injury. It is enough that the challenged price discrimination is a material cause of that injury. 901 F.2d at 1325–26; *see also Allied I*, 825 F.2d at 973 (" '[A] plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury....' "(quoting *Zenith Corp. v. Hazeltine*, 395 U.S. 100, 114, 89 S.Ct. 1562 n. 9, 23 L.Ed.2d 129 (1969))).

trieves the parts from the primary-line at the pre-established price, it is reasonable to conclude that the damage is already done. "Where there is evidence ... which tends to show that [the plaintiff's] losses were a result of defendant's conduct, as well as evidence which tends to show that his losses were attributable to other factors, it is normally up to the trier of fact to decide which is the case." *See Costner v. Blount Nat'l Bank Maryville, Tenn.*, 578 F.2d 1192, 1194–95 (6th Cir.1978). For these reasons, Maxon's motion for summary judgment on the issue of cognizable antitrust injury in the competition for the bid is denied.

### Non–Speculative Approximation of Damages

■ In *Allied Accessories and Auto Parts Co., Inc. v. General Motors Corp.*, ("*Allied I*"), the Sixth Circuit quoted *World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1478 (10th Cir.), *cert. denied*, 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985), which succinctly summarized the degree of certainty required to prove the amount of damages in an antitrust case:

> If the plaintiff has demonstrated some damage, the actual amount need not be proven to the same degree of certainty. *King & King [Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147, 1158 (10th Cir.1981), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982)]. "[A] plaintiff is not to be held to a rigid standard of proof regarding the amount of damages, since in such cases economic harm is frequently intangible and difficult to quantify." *Id.* at 1157. "While the damages may not be determined by mere speculation or guess, it will be

enough if the evidence show [sic] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *see also Los Angeles Memorial Coliseum Comm'n v. NFL*, 791 F.2d 1356 (9th Cir.1986) (plaintiff need only provide sufficient evidence to submit a just and reasonable estimate of damages).

825 F.2d 971, 973 (6th Cir.1987).

Maxon asserts that the evidence provided by IBS is speculative as a matter of law. Because, "[an approximation of ]damages is only speculative when the evidence is inadequate to supply the basis for [factual] determination," *see Id.* at 975, this court disagrees.

As to the amount of damages flowing from the impact of the price discrimination on the competition for the bid, Flora, in his deposition, sets forth the basis for his calculations. *See* Flora Deposition, at 190–91, 202 ("I know the jobs I've lost on price. Valves are 50 percent of the price of a gas train ... I can identify jobs that I lost where I knew valves were a factor.").[25] The Sixth Circuit has found previously that similar projections based on a plaintiff's experience can provide sufficient grounds for calculating damages. *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 405–7 (6th Cir.1999) ( ["A plaintiff's own projections and experience during its

---

**25.** *See also*, Flora Deposition, at 202 ("They [TMI, a competitor,] might have built 150 [gas trains], but to my salesmen's recollection we lost a hundred of them over the last 10 years at least because ... TMI is an air house

manufacturer. Air house manufacturers have higher volumes, bigger valves, and so [for] all the bigger valves we have to use Maxon and so we're always at a disadvantage with that.").

years of operation are sufficient to provide a reasonable basis for calculating damages."]); *Kabealo v. Huntington Nat'l Bank*, 17 F.3d 822, 827 (6th Cir.1994). Maxon has provided no support for the proposition that such evidence is, as a matter of law, insufficient to show "the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Allied I*, at 973. Flora also describes the approximate outcome of the lost bids on profits. ("[As to lost profits, on the jobs that were lost] ... between 15 and 30 percent ....") *Id.* at 198.

As to the amount of damages flowing from the impact of the price discrimination on the after-the-matter "purchase," IBS provides specific estimates for each of the past 10 years. *See* IBS' Second Supplement to its Rule 26 Disclosures (Difference between the price charged to Plaintiff and prices for comparable parts charged to similarly situated customers for the years 1993–2002; 1993—$9,006.29; 1994—$35,416.07; 1995—$21,545.13; 1996—$36,062.31; 1997—$12,246.41; 1998—$14,466.76; 1999—$10,905.05; 2000—$34,247.45; 2001—$8,455.91; 2002—$7,201.54). Again, Maxon has failed to provide adequate support for the proposition that such evidence is, as a matter of law, insufficient to show "the extent of the damages as a matter of just and reasonable inference. although the result be only approximate." *Allied I*, at 973.[26] Accordingly, to the extent that Maxon's motion for summary judgment is based on IBS' "speculative approximation of damages," it is denied.[27]

## V.

### Primary-line

As set forth above, IBS states that it is a "manufacturer's rep[resentative"] (i.e., sells burners) for Eclipse Products, whose manufacture (and therefore IBS' sale) of burners is in "direct competition" with Maxon. Beyond that statement, however, IBS is completely silent on a potential primary-line price discrimination claim.[28] At the same time, in its Brief in Opposition to Defendant's Motion for Summary Judgment, IBS claims that this is only a secondary-line case. Therefore, because the

---

**26.** In *Allied I*, the defendant manufacturer signed a contract with a certain one of the plaintiff's competitors which allowed that competitor to purchase the product at issue for 10 percent below warehouse distribution prices. 825 F.2d 971, 973 (6th Cir.1987). Several companies submitted bids to the customer for supplying the manufacturer's product. *Id.* The lowest bid was submitted by the competitor who had been given the discount, and the second-lowest bid was submitted by the plaintiff. *Id.* The customer subsequently chose the competitor, and the plaintiff brought suit alleging that the defendant's discount to that competitor violated the Robinson–Patman Act. *Id.*

**27.** At the very least, these pieces of evidence, viewed in the light most favorable to the nonmoving party, create a genuine issue of material fact that precludes the granting of summary judgment.

**28.** *See D.E. Rogers Assocs., Inc. v. Gardner–Denver Co.*, 718 F.2d 1431, 1438–39 (6th Cir. 1983)(To successfully prove price discrimination, where it was alleged that a price differential threatens a primary-line injury, the plaintiff is required to prove that (1) the defendant discriminated "in price between different purchasers of commodities of like grade and quality," and (2) the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce. * * * [Where] the plaintiff in a primary line case has not undertaken a general market analysis to prove anticompetitive effect, many of the courts to have recently considered Robinson–Patman Act claims look to evidence of predatory intent from which to infer injury to competition. *See, e.g., Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 696–98, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967) (citations omitted)).

claim has been disavowed, the court is not ruling on this issue of primary-line price discrimination in violation of Robinson–Patman.

## VI.

### Maxon's Unilateral Refusal to Deal

IBS claims that when Maxon terminated its relationship with IBS, it violated Robinson–Patman. However, "[n]othing in the Robinson–Patman Act imposes upon a supplier an affirmative duty to sell to all potential customers ... [and] absent monopolistic power, a seller may refuse to deal with anyone." *Ben B. Schwartz & Sons, Inc.*, 203 F.Supp. at 99.

In the instant case, IBS has failed to come forward with any evidence, or even allege, that the Maxon has "monopolistic power" within the relevant market.[29] The only statement concerning market presence—and, significantly, not market share—is that "Maxon is a $60,000,000 company with customers worldwide." This information tells us nothing about Maxon's monopolistic power within the relevant market. Accordingly, because IBS has failed to present any evidence creating a genuine issue of material fact as to Maxon's monopolistic power, Maxon is entitled to summary judgment on IBS' allegation that Maxon's unilateral refusal to deal is a violation of Robinson–Patman.

## VII.

### Statute of Limitations

Finally, Maxon correctly points out that IBS has not attempted to defend its request for damages beyond the four year statute of limitations. *Grand Rapids Plastics,* 188 F.3d at 405–7; *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d

1524, 1539 (3d Cir.1990). "For statute of limitations purposes, the focus is on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the effects of the overt acts." *Grand Rapids Plastics.* 188 F.3d at 405–7.

There are, however, two exceptions to the general four-year statute of limitations that must be examined. *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1051–52 (5th Cir.1982) (The two grounds for allowing an antitrust suit to be brought more than four years after the events that initially created a cause of action are derived from *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) and *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)). The party seeking to avoid the statute of limitations, bears the burden of proof. *Akron Presform Mold Co. v. McNeil Corp.,* 496 F.2d 230, 233 (6th Cir.1974).

The first of these is the "continuing violation" exception. The court in *Grand Rapids Plastics,* described the "continuing violation" exception as follows:

A continuing antitrust violation is one in which the plaintiff's interests are repeatedly invaded. When a continuing antitrust violation is alleged, a cause of action accrues each time the plaintiff is injured by an act of the defendants. Even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act .... An overt act that restarts the statute of limitations is characterized by two elements: (1) it must be a new and independent act that

---

**29.** While IBS does assert that Maxon is the exclusive provider of certain models of valves and burners, this does not necessarily amount to a claim that Maxon has monopolistic power within the relevant market. Moreover, IBS has failed to come forward with sufficient evidence to support such a claim, even if it were to be implied from the facts presented.

is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff (citing *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467–68 (6th Cir.1996) (internal quotations omitted)). 188 F.3d 401, 405–7 (6th Cir.1999).[30]

The second, the "speculative damages" exception, stays the limitations period so that it does not begin to run until the damages are ascertainable. *Kaiser Aluminum & Chemical Sales*, 677 F.2d at 1051–52.[31]

Because IBS has been silent on the applicability of both exceptions to the statute of limitations, it cannot be said that it can meet its burden of proof. Accordingly, Maxon's motion for summary judgment on the issue of the four year statute of limitations is granted.

## VIII.

For the foregoing reasons,

IT IS ORDERED that Maxon's summary judgment motion is hereby DENIED as to the secondary-line price discrimination claim, and GRANTED as to IBS' claim that Maxon's unilateral refusal to deal constituted a violation of Robinson–Patman, and GRANTED as to Maxon's statute of limitations defense.

IT IS SO ORDERED.

---

**30.** Applying this exception to the facts of its case, the court found that "the individual payments to [the defendant] were only a manifestation of the previous agreement. The individual payments therefore do not constitute a 'new and independent act,' as required to restart the statute of limitations." *Id.*

**31.** The Court in *Zenith* observed, however, that when a continuous antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of the defendants:

In the context of a continuing conspiracy to violate the antitrust laws ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and ... as to those damages, the statute of limitations runs from the commission of the act.
401 U.S. at 338, 91 S.Ct. 795.